JOINER, Judge.
Carlos Edward Kennedy was convicted of one count of capital murder for killing Zoa White during the course of a- first-degree burglary, see § 18A-5-40(a)(4), Ala.Code 1975. The State’s evidence at trial tended to establish that, at some point between the late evening hours of June 27, 2010, and the early morning hours of June 28, 2010, White was brutally murdered in her home, which, the State argued, occurred during the course of a first-degree burglary and which, the State theorized, was accomplished by using a claw hammer. Although when questioned by law enforcement Kennedy initially denied having known White or -having ever been in her house, the State presented evidence, which was confirmed by-DNA analysis, indicating that Kennedy’s blood was on several items in White’s house and evidence, which was confirmed by a latent-fingerprint examination, indicating that two of Kennedy’s palm prints were found in White’s house.
During the penalty phase of Kennedy’s trial, the jury, by a vote of 11 to 1, recommended that Kennedy be sentenced to death. After receiving a, presentence-in-vestigation report and conducting a sentencing hearing, the circuit court followed the jury’s advisory recommendation, finding that the. aggravating circumstances outweighed the mitigating circumstances, 8,nd sentenced Kennedy to death. Kennedy did not file any Rule 24, Ala. R.Crim. P., posttrial motions. This appeal, which is automatic in a case involving the death penalty, followed. • See § 13A-5-53, Ala. Code 1975.
On appeal, Kennedy raises several' issues. One issue, however, is dispositive of this appeal — namely, whether the circuit court committed reversible error when, after it initially determined that Kennedy could represent himself at trial, the circuit court rescinded that initial determination and revoked Kennedy’s right of self-representation, finding that Kennedy had not knowingly, voluntarily, and intelligently waived his right to counsel and appointing counsel to represent Kennedy at trial.[1] For the reasons set forth below, we reverse and remand.

Procedural History

The resolution- of the question Kennedy raises on appeal requires -this Court to *510 first .set out the lengthy procedural history regarding Kennedy’s request to represent himself at trial, the circuit court’s initial determination that Kennedy could represent, himself at trial, and the circuit court’s subsequent decision to revoke Kennedy’s right of self-representation.
Kennedy, after having been indicted on March 26, 2011, appeared in the circuit court on July 11, 2011, with counsel for arraignment. At arraignment, Kennedy’s counsel advised the circuit court that Kennedy “has decided he wants to represent himself’ at trial. (R. 10.) The circuit court confirmed with Kennedy his request to represent himself at trial and “urge[d] [him] not to do that and [to] think very seriously about it because [he was] in a very bad situation.” ‘ (R. 12.) Béfore it decided whether to honor Kennedy’s request, however, the circuit court ordered that Kennedy undergo a psychological evaluation.
On October 12, 2011, .Doug. MeKeown, Ph.D., a licensed clinical psychologist, conducted a psychological examination on Kennedy. Dr. MeKeown concluded that, although Kennedy had a history of marijuana and alcohol use, Kennedy was competent to stand trial, had “no indication or history of a mental health related disorder,” had “[n]o indication of psychological defects or intellectual limitations,” and had “no indication of- a .lack of capacity for appropriate decision making,” (C. 87.)
Thereafter, at a hearing held on December 15, 2011, Kennedy appeared without counsel in the circuit court.[2] At that hearing, the circuit court explained to Kennedy Dr. McKeown’s findings and also addressed Kennedy’s request to - represent himself at trial. As to Kennedy’s request to represent himself at trial, the following exchange occurred: ¡ . .
, “The Court: Let, me just try to be your best friend here. Why do you want to represent yourself? ..Let me back up a little bit. I was a lawyer for fourteen years. And I’ve been a judge for fourteen years. If I was charged with what you’re charged with I would not represent myself. I don’t — Let me tell you. Even if you know what to do, the fact that it’s you and not somebody else, it just — your personal connection with the case is going to just destroy your judgment. That’s the biggest problem; ■ Just go ahead and just talk. Why do you want to represent yourself?
“[Kennedy]: Well, I just feel confident that I can do it myself.
“The Court: Okay. You’re a well-spoken fellow. The problem is, like I say again, your hands are tied. Because it’s when you’re action — there are parts you play as yourself but then there are parts you play as a lawyer. And it’s just hard to separate the two. And what I would like you to think about it this. Let me appoint you a lawyer and why don’t you work with him? And if you don’t think that lawyer is working with you — let’s say you have a theory of how the’case is supposed to go,= what you would like to be done, witnesses you would like to be called or things you’d like to do — first of all, you need somebody on the outside tracking down witnesses; let’s say to get witness statements for you. - I know very little about the case and -right now I don’t ... want to know more. Let’s say that you need a fingerprint expert. You need a lawyer to go hire that fingerprint expert. For instance, talk to that person about what was found by the *511 State and whether it’s yours or not, that type of thing. Or DNA expert, the same thing. You just can’t do that from inside a jail cell. You’ve got to have somebody on the outside making those kind of decisions for you. There’s a lot to be done in a very little time frame. You’re just going to be — even if you were a thirty year, the smartest lawyer in the country, you just can’t-do from inside a jail cell. It would be impossible to do that. Do you get what I’m saying?
“[Kennedy]: I understand..
“The Court: I mean, the State of Alabama in a lot of ways, if people will take advantage of it, we have money available that we want to try to give you the best defense — we want to give you the best defense there is. But you’ve got to let us help you. Are you willing to do that? Listen. It’s not like you’re getting married without any chance of getting a divorce. The old days you couldn’t get a divorce. If you get involved and you say I just don’t like these lawyers, we can’t work together, they’re not listening to my input on the thing, you know how to write me. You write me a letter and we’ll talk about it. But I’m just afraid that — Let me ask 'you this. Do you want to win or do you just want to go and be executed? ■
“[Kennedy]: I would like to — First of all I believe — first of all I- believe this has — this is somewhat — I -want to win but also at the same time I want to save my reputation. I don’t just want to—
“The Court: Well, if you want' to win you want to [be] exonerated or whatever, then you don’t want to represent yourself. The reason I asked you that is if you wanted to commit suicide, which some people do, they just want to throw their life away and say let’s get ⅜ over it, then it may be the best thing to do. But if you want to win or have a chance at winning, the chance of winning is with a lawyer. Because like I said, not only do they know the law and the courtroom but you peed somebody on the outside doing the work that you can’t do. Like I say, talking to witnesses, getting their statements written down, hiring experts, doing that kind, of thing that you just don’t have the ability , to do in jail, because you can’t — you’re in a little cell and you can’t get out and track down witnesses to get. their statements. I don’t have any doubt you have the intelligence to do it. It’s just because you’re confined. You can’t do it.
“The Court: Yes. In fact, it’s going to probably be more difficult to save your reputation by you representing yourself. I mean, just because you hire a lawyer that’s no — or I appoint you a lawyer, doesn’t mean anything.' it .means you’re smart is what it means. But like I said, you can proceed down this road and if you decide it’s not the right way to go then you write me up and say, ‘Judge, I can’t work with these people; they’re not doing what I say.’ But let’s just say you talk to one of them and say, ‘Hey, if you would talk to this person they can give you some information that will help me.’ And then the lawyer goes to talk to that: person and they say, yeah, ■ I think' that might be helpful. ■ So they take ■ the person’s - statement. They make sure they’re subpoenaed to be here at trial. That’s real helpful to you. But you can’t do that. You could subpoena them, yeah.- But you might have drug down here and they may not say what you think they’re-going to say. So there are just a lot of things that you don’t have the ability to do because your hands are tied from being in jail. But if you’re dead set on it I just need to go through some of the legal procedure and make sure-you understand.
*512 “[Kennedy]: Right. I’m fine with defending myself.”
(R. 29-34.) The circuit court then asked Kennedy about his background and education. Kennedy explained that he had graduated from a private high school in Mobile and also attended the University of Mississippi for two years. Kennedy further, explained, that, since 2000, he had been “[wjorking with [his] father installing satellite dishes” (R. 35) and that he knows some computer programming.
After engaging Kennedy in tills colloquy, the circuit court commented that Kennedy is an “above average intelligent person and ... understand^] what’s going on here.” (R. 36.) The circuit court then questioned Kennedy about his ease, and Kennedy confirmed to the circuit court that he understood that he could have counsel appointed to represent him, that he would be limited in his ability to prepare for his case because he was being held in the county jail, that there are rules of procedure with which he would need to comply, and that the circuit court was not going to “give [him] a lot of slack.” (R. ' 39.) .
Thereafter, Kennedy, asked the circuit court to allow him to withdraw his plea of not guilty by reason of mental disease or defect and to allow him to enter only a plea of not guilty; the circuit court did so. The circuit court then instructed Kennedy to compile a list of witnesses he wanted to subpoena for trial and told him to send that list to the circuit clerk’s office. Kennedy then requested that the circuit court provide him with‘a transcript from his preliminary hearing and bond hearing and also requested that the State provide him with discovery. After- a brief- discussion about Kennedy’s request for a transcript and discovery, the circuit court provided Kennedy with a copy of the Alabama Criminal Code, which the circuit court earmarked to highlight the Code section'under which Kennedy was charged, and the circuit court, out of an “abundance of caution,” rearraigned Kennedy.
That same day, the circuit court memorialized that hearing in a written order, in which the circuit court granted Kennedy’s request to represent himself at trial, finding:'
■ “[Kennedy] !can read, write, and understand the English language. In fact, [Kennedy] is well spoken and advised the Court that he had graduated from a private high school in Mobile- County and completed two years of- college at the University of Mississippi. After fully explaining the disadvantages of proceeding pro• se (as his own lawyer) the Court' finds that [Kennedy] has knowingly, intelligently, and voluntarily waived his right to legal counsel. The Court advised [Kennedy] that the State is seeking to impose the death penalty. The Court advised [Kennedy] that should he change his mind and desire to be represented by legal counsel or to have the assistance of legal counsel as a ‘back up’ the Court will appoint a qualified lawyer to assist him.” .. .
(C. 90.)
Kennedy later wrote a letter addressed to the circuit court asking why, after having read the Code section provided to him by the circuit court, his indictment did not charge him with both burglary and capital murder. In response to that letter, which the circuit court treated as a motion, (supplemental record on appeal, C. 38), the circuit court conducted a hearing, which was held on January 19, 2012.
At that hearing, the circuit court addressed Kennedy’s letter and explained to him that burglary was an element of the charged offense of capital murder and denied Kennedy’s motion. Additionally, the circuit court addressed its previously is *513 sued order, which instructed the State to amend Kennedy’s capital-murder indictment to include the specific Code section under which Kennedy was charged, and thereafter read the amended Indictment to Kennedy.
At that time, the circuit court also addressed Kennedy’s request for discovery and ordered the State to provide Kennedy with discovery at the next hearing. Additionally, the circuit court addressed a motion filed by Kennedy “about DNA evidence.” In addressing that motion, the circuit court explained to Kennedy that it would be difficult for him to get DNA evidence examined because of his incarceration. The circuit court also explained that it could grant a request from Kennedy for funds to hire an expert witness. The circuit court cautioned, however, that it would not recommend an expert for Kennedy to hire. Thereafter, the circuit court again urged Kennedy to reconsider his decision to represent himself at trial and asked that Kennedy allow the circuit court to appoint him counsel; Kennedy declined.
After Kennedy again expressed his desire to represent himself at trial, the circuit court again asked Kennedy about his education and background and again advised him of the dangers and disadvantages of self-representation. In so advising, the circuit court explained that, although it would provide Kennedy a copy of the Alabama Rules of Evidence and could “answer some questions about procedures,” it would not give Kennedy legal advice or “bend over backwards because [Kennedy was] a layperson.” (R. 60.) The circuit court then asked Kennedy if he was attempting to commit suicide by insisting on representing himself at trial. Kennedy explained to the circuit court that he was not attempting to commit suicide and that he believed he could adequately represent himself at trial.
On February 2, 2012, in open court, the State provided Kennedy with discovery. After the State provided: Kennedy with discovery, the circuit court provided Kennedy with a copy of the Alabama Rules of Court, a book containing the procedural rules used in Alabama courts.
Thereafter, on March 1, 2012, the circuit court conducted another hearing with Kennedy and explained to him the following:
“The Court: We set today as a deadline for you to tell me about either whether you wanted me to appoint counsel or whether you wanted to continue to represent yourself. But let me tell you this. I’ve been looking — I’ve got hundreds of cases. So I don’t know them all very well. I know just a little bit. Yours is: what’s called, a circumstantial evidence case. Circumstantial evidence is the same evidence — is the same type evidence as eyewitness. But circumstantial evidence relies a lot on experts as kind of we talked before. And in a case where a lawyer was representing you, the lawyer would be hiring a DNA expert, et cetera. You still want, to represent yourself? Is that — Even after all the warnings I’ve given you is that—
“[Kennedy]: Correct.
“The Court: Okay. And I’ve told you though you need probably to hire outside experts to take statements, et cet-era. Let me ask you this. To me, it makes a lot of sense for me to appoint— there are a lot of different terms, amicus counsel is the legal term, a shadow counsel is the other, but an outside lawyer that wouldn’t try your case; you could try your case, whatever you wanted to do, but to do at least the outside work to hire a DNA person, have the sample, to act as your assistant outside of court so they can get some things done for you *514 so you could have the tools you need at trial to defend yourself. Does that make sense to you?
“[Kennedy]: Yeah, it does.” •
(R. 76-77.) Thereafter, the circuit court introduced Jason Darley to Kennedy and, over Kennedy’s objection, appointed Dar-ley to serve as Kennedy’s “shadow counsel.” The circuit court, however, assured Kennedy that Darley would not be “running [the] case” but could, instead, help Kennedy obtain-expert witnesses. - Kennedy told the circuit court that he would rather not have Darley involved in the case. In response, the circuit court again asked Kennedy if he was on a “suicide mission” and asked Kennedy for a reason as to why he did not want Darley to serve as his “shadow counsel.” Kennedy explained that he had “reasons” and that those reasons went “to [his] defense and [he was] not really going to express that until trial.” (R. 81.) Thereafter, the following exchange occurred:
“The Court: Okay. But you’ve'told me 'before about needing outside witnesses ■and experts hired. We talked about that before. And I’ve kind of explained to you that procedure. And you can’t do it because you’ré locked up.
’“[Kennedy]: And all that crossed my mind until I got the discovery and the court reporting.
“The Court: Right. But after reading the discovery, didn’t you understand that you need to hire some people or some people need to be hired tó come in and testify as experts or to 'do some work?
“[Kennedy]: Actually I decided not to because of the discovery.
“The Court: Okay. You decided not to do that because of the discovery.
“Okay. What I’m going to do then, after you looking through all the documents and all you don’t think you need any experts hired at all; correct?
“[Kennedy]: As of right now, no.”
(R. 81-82.) The circuit court then assured Kennedy that Darley would not speak with Kennedy unless Kennedy wanted him to and that Darley was “not going to interfere.” (R. 84.)
On March 8, 2012, Kennedy filed a motion with the circuit court requesting that his sister, Verlisa Kennedy (“Verlisa”), be appointed as his cocounsel. In that motion, Kennedy explained that he “completely understood the argument [the circuit court] made referencing the fact that [he] needed someone to .accomplish certain tasks outside of these bars,” but that the “issue'that [he] had was and still is an issue of trust.” (C. 96.) Kennedy further explained that if he “was forced to trust anyone other than [him]self, it would be [Verlisa].” (C. 96.) The circuit court denied Kennedy’s motion on April 23, 2010, in a handwritten notation on Kennedy’s motion stating simply, “4-23-10 Nonlaw-yer can’t be cocounsel or appear in court.” (C. 96.)
On May 3, -2012, Kennedy filed a letter with the circuit court asking for clarification as to why Verlisa could not serve as his cocounsel and “where that rule can be found” and also asked the circuit court to provide him with various legal materials. (Supplemental Record on Appeal, C. 45.)
On June 14, 2012, the circuit court conducted a hearing to address Kennedy’s letter. The circuit court explained to Kennedy that § 34-3-6, Ala.Code 1975, precludes a nonlawyer from representing him in court. With regard to Kennedy’s request for legal materials, the circuit court explained that Kennedy was “asking [the circuit court] to provide [him] with a law library” (C. 92), and stated further that Kennedy was “asking [the circuit court] to teach [him] criminal law and constitutional *515 law in three or four months.” (R. 94.) The circuit court told Kennedy that it would not provide him the requested legal materials.
Without further engaging the circuit court about his sister serving as cocounsel and without further discussing the ruling about receiving legal materials, Kennedy requested that the State be ordered to provide him with the contact information for the State’s latent-fingerprint examiner and also requested that the circuit court provide him with a copy of the district court file associated with his ease. The circuit court agreed to provide Kennedy with a copy of the district court file, explained to Kennedy that Verlisa could help him contact the State’s latent-fingerprint examiner, and “urge[d] [Kennedy] to consult with Mr. Darley and get a proper defense going.” (R. 96.)
On June 21, 2012, Kennedy appeared in the circuit court and, among other things, renewed his request that the circuit court provide him with certain legal materials. Kennedy explained that he had a list of the books he needed and the circuit court told Kennedy to provide both it and Darley with a copy of the list of books. Kennedy explained that he would rather not send the list to Darley and would, instead, prefer to send the list only'to the circuit court. The circuit court responded:
“That’s not my job. So don’t submit it to me. I’m not going, to supply you with any books. If you want to get it and send it to Mr. Darley and send me a copy. The only reason you send me a copy is we’ll see if we can handle the security of getting you books over there. I’m not your advocate. I’m not your attorney. I’m the referee who sits in the middle. So I can’t be advising you and giving you books and that kind of thing. I will try to let them give you things over there that I think you need. That’s why I want to see a copy of it.”
(R. 108.) Kennedy then asked the circuit court for funds to hire a DNA expert, and the circuit court- told Kennedy to file a motion. ' ' - .
On July 12, 2012, the State, in open court, provided Kennedy with supplemental discovery! and with notice of its intent to use Rule 404(b), Ala. R. Evid., evidence. Kennedy then asked the circuit court about a motion he had filed requesting funds to hire an expert witness; he requested that the circuit court order the State to provide him with copies of CDs and DVDs taken from his house during the execution of a search warrant; and he requested that the circuit court order the State to provide him with contact information for the State’s latent-fingerprint examiner and a list of all “physical items” in the State’s possession.. The circuit court granted each of Kennedy’s requests.
Thereafter, on October 26, -2012, without Kennedy, having filed. any additional motions and without having conducted any further hearings, .the circuit court issued a written order rescinding its initial order allowing.-Kennedy to represent himself. Specifically, the circuit court, after setting out some of the relevant procedural history, found, in part:
“After’ dealing with [Kennedy] for 10 months it is the Court’s opinion that [Kennedy] was either being deceptive, a good actor or has suffered mental deterioration while incarcerated. [Kennedy] has no capacity to defend himself and has no idea what needs to be done in order to prepare for trial. As this is a Capital- Murder case in which forensics may be a. critical; factor, [Kennedy] is totally oblivious of what needs to be done regarding retaining experts, having samples tested, and preparing cross examination. As to mitigation, if neces *516 sary, [Kennedy], once again seems to take the attitude that he will take care of that later.
“Thus, it is the judgment of this Court that [Kennedy] HAS NOT, knowingly, intelligently and voluntarily waived his right to legal counsel as required by the United States Constitution.”
(C. 115-16 (capitalization in original).) The circuit court then appointed Darley to represent Kennedy at trial.[3]
Kennedy chose not to cooperate with his appointed counsel. Thus, on January 9, 2013, the circuit court held a hearing and explained to Kennedy that, as a result of his decision not to cooperate with his appointed counsel, Kennedy would no longer be allowed to receive visitors in the county jail.[4] Kennedy’s counsel explained to the circuit court that counsel “was prepared ... to propose to the [circuit] court that Mr. Kennedy be allowed to exercise his Constitutional right to represent himself’ at trial and that counsel was “prepared to ask the [circuit] court to reconsider” the October 26, 2012, order appointing counsel for Kennedy. Counsel further explained that the proposal would be to allow Kennedy to proceed with a hybrid-type of representation, in which Kennedy would “be in charge of his own defense, conduct his own defense, with the assistance of [counsel] in both a procurement of resources that he needs to do that, the retention of appropriate experts for that process, to help educate him regarding the law and the applicable rules of evidence of criminal procedure, and [Kennedy] has rejected that proposal.” (R. 174.) The circuit court responded that it “had kind of come to that conclusion that if [Kennedy] was willing to work with [counsel], that might be a satisfactory way to handle it.” (R. 175.) Thereafter, Kennedy proceeded to trial with his appointed counsel.
After conducting voir dire and before the State’s case-in-chief, however, an in camera hearing was held to address counsel’s concerns regarding Kennedy’s lack of cooperation with counsel’s mitigation strategy and investigation. In an effort “to kind of give a fresh voice and fresh face to this issue” (R. 1278), another circuit court judge — Judge Ben Brooks — conducted this in camera hearing; Judge Joseph Johnston, who was assigned to Kennedy’s ease, had conducted all other proceedings. At that hearing, Kennedy’s counsel explained that, because Kennedy had refused to cooperate with counsel, counsel had “essentially fashioned [their] own mitigation strategy.” Counsel explained to Judge Brooks their proposed mitigation strategy and the steps taken by counsel to investigate that strategy. Judge Brooks then addressed Kennedy in a lengthy colloquy regarding the dangers of not cooperating with counsel’s mitigation strategy. During that colloquy, the following exchange occurred:
“The Court: Do you still, sir, wish to not cooperate with the attorneys in the preparation and presentation of potentially additional mitigating circumstances?
“[Kennedy]: Yes, sir.
“The Court: And why is that, Mr. Kennedy?
“[Kennedy]: Because if I can’t do it myself then I don’t want it done.
“The Court: Why is that, Mr. Kennedy?
*517 “[Kennedy]: Because — Well, there’s a number of reasons. One is trust. Two, I felt what I was doing, was sufficient. Those are the main two.”
(R. 1293.) Judge Brooks then advised Kennedy of the complex nature of a capital-murder ease and advised him that Kennedy had “no experience like that handling a capital-murder case.” (R. 1294.) Thereafter, Kennedy informed Judge Brooks that, not only did he not want to cooperate with his counsel’s mitigation strategy, but he also wished to waive the presentation of any mitigation evidence at trial, explaining that “[i]f [he] can’t do it; [he does not] want it done.” (R. 1297.) Judge Brooks then conducted another colloquy addressing Kennedy’s request to waive the presentation of all mitigation evidence. Judge Brooks then stated that he was “going to ,.. leave it to Judge Johnston to — he’s got to control the conduct of trial. Whether Judge Johnston orders that you still will be allowed to present that mitigation evidence even in the face of that objection I’m going to leave to him.” (R. 1304.) Kennedy’s case then proceeded to trial.,
At trial, Kennedy’s appointed counsel conducted all trial proceedings, including giving an opening statement, cross-examining the State’s witnesses; making objections, and presenting a closing argument. Additionally, Kennedy’s appointed counsel called Kennedy to testify in his own behalf. Kennedy, however, refused to answer his appointed counsel’s questions other than his counsel’s question, “Do you have anything else you would like to tell the jury?” In response to that question, Kennedy ex? plained, among other things, that he had been “previously allowed to defend himself but that was taken away from [him],” and that he was not cooperating with his appointed counsel. (R. 1635.) The jury found Kennedy guilty as charged in the indictment.
Kennedyis case then proceeded to the penalty phase of trial. Before the State presented evidence at the penalty phase, however, the circuit court again addressed Kennedy’s desire to forgo the presentation of mitigation evidence. The circuit court discussed with Kennedy the dangers and disadvantages of his request to forgo all mitigation evidence and,' thereafter, ‘allowed Kennedy to waive the presentation of all mitigation evidence. Because the circuit court granted Kennedy’s request, Kennedy’s counsel did not make an opening statement, cross-examine the State’s witnesses, present any mitigation evidence, or. make a closing argument. The circuit court, however, allowed Kennedy to make a statement to the jury, in which Kennedy told the jury that his decision “to speak is not to sway [the jury’s] decision on whether [it] want[s] to give [him] life without or the death penalty” (R. 1771); instead," he wanted to speak so that he could “explain [his] situation.” (R. 1771.) Specifically, Kennedy explained' to the jury that, although he had wanted to represent himself at trial and was initially allowed to do so, the circuit court revoked his right to represent himself and counsel was forced on him. Kennedy stated that he did not cooperate with his counsel and, as a result, the circuit court took away his jail-visitation privileges. Additionally, Kennedy explained that he was innocent.
After ' hearing closing argument from only the State and after being instructed by the circuit court, the jury, by a vote of 11 to 1, recommended that Kennedy be sentenced to death.

Discussion

As set out above, on appeal Kennedy contends that the circuit court committed reversible error when it issued an order revoking Kennedy’s right of self-representation, finding that Kennedy had not knowingly, voluntarily, and intelligently waived *518 his right to counsel, and appointing counsel to represent Kennedy at trial,[5]
We review a circuit court’s decision to deny a defendant the right of self-representation for an abuse of discretion. See Ford v. State, 516 So.2d 34, 43 (Ala. Crim.App.1986) (“A trial court’s decision following a Faretta [v. California, 422 U.S. 806 (1975),] hearing is reviewed for abuse of discretion.”). If we determine that a circuit court has abused its discretion in denying a defendant’s right of self-representation, that “denial is not amenable to ‘harmless error’ analysis. The right is either respected or denied; its deprivation cannot be harmless.” McKaskle v. Wiggins, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). See also Neder v. United States, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (recognizing that the erroneous denial of the right of self-representation at trial is structural error “subject to automatic reversal”). Cf. Cobb v. State, 155 So.3d 318, 323 (Ala. Crim.App.2014) (“An invalid waiver of the right to counsel is a jurisdictional defect, and ‘[a] jurisdictional defect defies analysis by a harmless-error standard and is per se ground for reversal, requiring no consideration of whether the defendant was prejudiced as a result of the error.’ Ash v. State, 843 So.2d 213, 219 (Ala.2002), overruled on other grounds, Ex parte Seymour, 946 So.2d 536 (Ala.2006), quoted in Powers v. State, 38 So.3d 764, 768-69 (Ala. Crim.App.2009).”). With this in mind, we address Kennedy’s claim on appeal.
It is well settled that, under the Sixth Amendment to the United States Constitution, an “indigent defendant in a criminal trial has a constitutional right to the assistance of appointed counsel.” Martinez v. Court of Appeal of California, 528 U.S. 152, 158, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000) (citing Gideon v. Wainwright, 372 U,S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)). At the same time, however, the United States Supreme Court has also held that a defendant in a criminal trial has a constitutional right of self-representation under the Sixth Amendment. See Faretta v. California, 422 U.S. 806, 832, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (recognizing a constitutional right of self-representation, but also recognizing that “the right of an accused to conduct his own defense seems to cut against the grain of this Court’s decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel”).
In Faretta, the United States Supreme Court explained that “[i]n the federal courts, the right of self-representation has been protected by statute since the beginnings of our Nation,” 422 U.S. at 812, and that, “[w]ith few exceptions, each of the several States also accords a defendant the right to represent himself in anf criminal case.” 422 U.S. at 813. The Court also found that it had “indicated the same view” in Adams v. United States ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942), Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), and Price v. Johnston, 334 U.S. 266, 68 S.Ct-. 1049, 92 L.Ed. 1356 (1948), and that “[t]he United States Courts of Appeals have repeatedly held that the right of self-representation is protected by the Bill of Rights.” Faretta, 422 U.S. at 814-17. The Court then explained:
“This Court’s past recognition of the right of self-representation, the federal-court authority holding the right to be of *519 constitutional dimension, and the state constitutions pointing to the right’s fundamental nature form a consensus not easily ignored. ‘[T]he mere fact that a path is a beaten one,’ Mr. Justice Jackson once observed, ‘is a persuasive reason for following it.’ We confront here a nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an umvilling defendant is contrary to his basic right to defend himself if he truly wants to do so. ”
Faretta, 422 U.S. at 817 (footnote omitted; emphasis added). - The Court explained that this “universal conviction” is “soundly premised” because, it concluded, the “right of self-representation finds support in the structure of the Sixth Amendment,-as well as in the English and colonial jurisprudence from which the Amendment emerged.” Faretta, 422 U.S. at 818. The Court also explained: •
“It is undeniable that in most criminal prosecutions defendants could better defend with counsel’s guidance than by their own unskilléd efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer’s training and’ experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him, Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and ■not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant,'therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And althcmgh he may conduct his own defense ultimately to his own detriment, his choice must be honored out of ‘that respect for the individual which is the lifeblood of the law.’ Illinois v. Allen, 397 U.S. 337, 350-351 [(1970)] (Brennan, J., concurring).”
Faretta, 422 U.S. at 834 (footnotes'omitted; emphasis added). The Court warned, however, that by representing himself at trial, a defendant “relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel,” id. at '835; thus, the Court held that, “in order to represent himself, the accused must ‘knowingly and intelligently’ forgo those relinquished benefits,” id. (citing Johnson v. Zerbst, 304 U.S. 458, 4:64-465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)), and that “he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that ‘he knows what-he is doing and his choice is made with eyes open.’ Adams v. United States ex rel. McCann, 317 U.S., at 279.” Faretta, 422 U.S. at 835.
Although the Court in Faretta recognized a federal constitutional right of self-representation, the State of’Alabama has, in cases predating Faretta, recognized a state constitutional right of self-representation under Art. I, § 6, Ala. Const. 1901 (Official Recomp.).[6] See, e.g., Irvin v. State, 44 Ala.App. 101, 103-04, 203 So.2d 283, 285-86 (1967) (“Constitution 1901, § 6, gives the accused the ‘right to be heard by himself and counsel, or either.’ ... A *520 defendant may knowlingly [sic] waive this right of locally licensed counsel. Breier v. Gladden, D.C., 229 F.Supp. 823 [(D.Or. 1964) ].”). Regardless of our historical recognition of a state constitutional right of self-representation, however, both this Court and the Alabama Supreme Court use the Faretta framework to assess the propriety of a circuit court’s decision either to grant or to deny a defendant the right to represent himself or herself. See, e.g., Tomlin v. State, 601 So.2d 124, 128 (Ala.1991);- Woodruff v. City of Pelham, 1 So.3d 157, .160 (Ala.Crim.App.2008); Baker v. State, 933 So.2d 406, .410 (Ala.Crim.App. 2005); Moody v. State, 888 So.2d 532, 554 (Ala.Crim.App.2003); Monte v. State, 690 So.2d 516, 517 (Ala.Crim.App.1996); Sibley v. State, 775 So.2d 235, 242-43 (Ala.Crim. App.1996) (opinion on return to remand); Block v. State, 744 So.2d 404, 408-09 (Ala. Crim.App.1996); and Hairgrove v. State, 680 So.2d 946, 946-47 (Ala.Crim.App.1995). This framework ’ applies even in those cases where a defendant is charged with a capital offense and is faced with the possibility of a death sentence. See, e.g., Moody, supra; Sibley, supra; and Block v. State, 744 So.2d 404 -(Ala.Crim.App. 1996).
Additionally, the Faretta framework is memorialized in the Alabama Rules - of Criminal Procedure, as the procedure to be undertaken when a defendant requests to waive his ,or her right to counsel — specifically, Rule 6.1(b), Ala. R.Crim. P., which provides, in part:
“A defendant may waive his or her right to counsel in writing or on the record, after the court has ascertained that the defendant knowingly, intelligently, and'voluntarily desires to forgo that right. At the time of accepting a defendant’s waiver of the right to counsel, the court shall inform the defendant that the waivér may be withdrawn and counsel appointed or retained at any stage of the proceedings. When a defendant waives the right to counsel, the court may appoint an attorney to advise the defendant during any-stage of the proceedings.- ■ Such advisory counsel shall be given notice of all matters of which the defendant is notified.”
(Emphasis added.)
The Committee Comments to Rule 6.1, Ala. R.Crim, P., characterize the right of self-representation as an “absolute right,” explaining that “a criminal defendant has an absolute right to defend pro se under Art. I, § 6, Alabama Constitution of 1901, Luckie v. State, 55 Ala.App. 642, 318 So.2d 337 (1975), cert, denied, 294 Ala. 764, 318 So.2d 341 (197[5]), and the Sixth Amendment to the United State's Constitution, Faretta v. California, 422 U.S. 806 (1975).” (Emphasis added.) This “absolute right,” however, does not appear to be truly “absolute.” Rather, the right of self-representation has some clearly-defined limitations. Indeed, the United States Supreme Court has recognized that the Faretta decision itself places certain limitations on the right of self-representation. See Indiana v. Edwards, 554 U.S.. 164, 171, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008) (“Faretta itself .'.. ma[kes][it] clear that the right of self-representation is not absolute.”).
Our courts have interpreted Faret-ta as requiring a defendant ‘to “clearly and unequivocally” invoke his or her right of self-representation, See, e.g., Tomlin v. State, 601 So.2d at 128 (“ ‘A waiver of counsel can only be effectuatéd when the defendant asserts a “clear and unequivocal” right to self-representation.’ Westmoreland v. City of Hartselle, 500 So.2d 1327, 1328 (Ala.Cr.App.1986), citing Faretta, 422 U.S. 806, 95 S.Ct. 2525.”). See also Stano v. Dugger, 921 F.2d 1125, 1144 (11th Cir.1991) (“Once the right of self-represen *521 tation has been asserted clearly and unequivocally, understandable to the trial court by the reasonable person standard, then and only then is that court, under Supreme Court and Eleventh Circuit case law, required to conduct the requisite inquiry to determine whether the criminal defendant’s decision to represent himself is knowing, intelligent and voluntary. Faret-ta, 422 U.S. at 835.”). Additionally, we require that a defendant make the request to represent himself or 'herself at trial known in a timely manner. See, e.g., Upshaw v. State, 992 So.2d 57, 60 (Ala.Crim. App.2007) (“Upshaw waived his right to self-representation by failing to assert it in a timely manner.”).
Once a defendant “clearly and unequivocally” invokes the right of self-representation and does so in a timely manner, our courts appear to recognize two possible grounds on which to limit a defendant’s right of self-representation at trial: (1) whén a defendant engages in obstructionist behavior, see e.g., Moody v. State, 888 So.2d 532 (Ala.Crim.App.2003) (holding'that Moody’s “obstructionist” behavior constituted a waiver of his Sixth Amendment right to counsel and that the circuit court did not err when it denied Moody’s request for a continuance so that he could secure the services of an attorney); or (2) when a defendant has not knowingly, intelligently, and voluntarily waived his right to counsel.[7] See Rule 6.1(b), Ala. R.Crim. P. *522 See also Tomlin, 601 So.2d at 128; Woodruff, 1 So.3d at 160; and Baker, 933 So.2d at 410.
Here, the record on appeal demonstrates that Kennedy both “clearly and unequivocally” informed the circuit court that he wished to represent himself at trial and that he made his request known in a timely manner.[8] Additionally, nothing in the record on appeal demonstrates that, either before or after Kennedy was granted the right of self-representation, Kennedy had engaged in any obstructionist behavior. Moreover, nothing in the circuit court’s order revoking Kennedy’s right of self-representation suggests that “obstructionist behavior” was a basis for revoking Kennedy’s right of self-representation.[9]
Rather, the only basis provided by the circuit court when it decided to revoke Kennedy’s right of self-representation was that Kennedy had not knowingly, voluntarily, and intelligently waived his right to counsel. Thus, we examine only that specific limitation on the right of self-representation. ' ■
With regard to that specific limitation, the Alabama Supreme Court has explained:
. “Although .the Supreme Court in Far-etta states that a defendant should be ■made aware of the dangers and disadvantages of self-representation, the Supreme Court does not require a specific colloquy between the trial judge and the defendant.. ‘The, case law reflects that, .while,a, waiver hearing expressly addressing the disadvantage. of a pro se defense is much to be preferred, it is not absolutely necessary. The ultimate test is not the trial court’s express advice but rather the defendant’s understanding. Fitzpatrick v. Wainwright, 800 F.2d 1057 (11th Cir.1986) (citations. omitted). In each case the court needs to look to the particular facts. and circumstances involved, ‘including the background, experience, and conduct of the accused.’ Johnson v, Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).
“This court looks to á totality of the circumstances involved in determining whether the defendant knowingly and intelligently waived his right to counsel. Jenkins v. State, 482 So.2d 1315 (Ala.Cr. App.1985); King v. State, 55 Ala.App. 306, 314 So.2d 908 (Ala.Cr.App.1975), cert. denied; Ex parte King, 294 Ala. 762, 314 So.2d 912 (1975).”
Tomlin v. State, 601 So.2d at 128-29.
“The Alabama Supreme Court in Harris v. State, 27 So.3d 582 (Ala.2008), dis *523 cussed some of the factors relevant to making this determination:
“ ‘In Tomlin [v. State, 601 So.2d 124 (Ala.1991),] this Court discussed six factors a court should weigh in determining whether, under the totality of the circumstances, a defendant has knowingly, intelligently, and voluntarily waived his or her right to counsel. This Court listed the following six factors:
“ ‘ “ ‘(1) [W]hether the colloquy between the court and the defendant consisted merely of pro forma answers to pro forma questions, United States v. Gillings, 568 F.2d 1307, 1309 (9th Cir.), cert. denied, 436 U.S. 919, 98 S.Ct. 2267, 56 L.Ed.2d 760 (1978); (2) whether the defendant understood that he would be required to comply with the rules of procedure at trial, Faretta [v. California, 422 U.S. 806] at 835-36, 95 S.Ct. [2525] at 2541-42 [(1975)]; Maynard v. Meachum, 545 F.2d 273, 279 (1st Cir.1976); (3) whether the defendant had had previous involvement in criminal trials, United States v, Hafen, 726 F.2d 21, 25 (1st Cir.), cert. denied, 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984); (4) whether the defendant had knowledge of possible defenses that he might raise, Maynard, supra; (5) whether the defendant was represented by counsel before trial, Hafen, supra; and (6) whether “stand-by counsel” was appointed to assist the defendant with his pro se defense, see Faretta, supra, at 834 n. 6, 95 S.Ct. at 2540 n. 6; Hance v. Zant, 696 F.2d 940, 950 n. 6 (11th Cir.), cert. denied, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), overruled on other grounds, Brooks v. Kemp, 762 F.2d 1383 (11th Cir.1985).’ ”
“ ‘601 So.2d at 129 (quoting Tomlin v. State, 601 So.2d 120, 124 (Ala.Crim. App.1989)).’
“27 So.3d at 586 n. 3.”
Cobb v. State, 155 So.3d 318, 321-22 (Ala. Crim.App.2014): Importantly, “ ‘ “[a]ll factors need" not point in the same direction.”-’ ” Johnson v. State, 40 So.3d 753, 757-58 (Ala.Crim.App.2009) (quoting Sibley v. State, 775 So.2d 235, 243 (Ala.Crim. App.1996), quoting in turn, United States v. Cash, 47 F.3d 1083, 1089 (11th Cir. 1995)). Thus, as long as a defendant, given the “totality of the circumstances,” understands the dangers and disadvantages of waiving the right, to counsel and makes a decision to represent himself at trial “‘with eyes open,’” Faretta, 422 U.S. at 835 (quoting Adams v. United States ex rel, McCann, 317 U.S. at 279), he is -entitled to represent himself at trial.
In this case, the circuit court, as set out above, allowed Keiinedy to represent himself for approximately 10 months before revoking Kennedy’s right of self-representation. ‘ In its order, the circuit court pointed to three different circumstances that, it believed, established that Kennedy did not understand the right he was waiving and; thus, had not knowingly, intelligently, and voluntarily waived his right to counsel. Specifically, the circuit court first explained: '
“The Court exhaustively went over the requirements as set out by Faretta and its progeny. Further, the Court explained in detail that the Court’s role was that of an impartial umpire and could not advise [Kennedy] what to do or give him legal advice. Further, the Court advised [Kennedy] that even if he were fully capable by education, training, and experience to represent himself, the fact that he was incarcerated would *524 pose an almost insurmountable handicap in that he could not perform functions necessary for his defense because he was in jail. There are security regulations at Mobile Metro Jail for which this Court will not interfere with; for example, prevent an .inmate from possessing compact discs or DVDs. Much .of the State’s discovery which has been produced and turned over to [Kennedy], is on these forms of medium. Thus, he is unable to review it. The Court h.as explained these and other handicaps to [Kennedy], but in the Court’s judgment, [Kennedy] seems not to understand either intellectually or mentally.”
(C. 114.) The circuit court next explained that each time Kennedy appeared in court
“he asked the Court virtually the same questions, which were generally: 1. Legal advice, 2. Practical advice such as what type of expert he should hire, and 3. Requests that ‘nonlawyers’ such as his sister serve as his counsel (which was also requested in a March 8, 2012 letter and denied April 23,2012)....
“Despite the ruling in # 3 above, both in writing and in open court, [Kennedy] sent another letter, dated May 3, 2012 asking the Court tell him ‘where that rule can be -found’ and asking for other information as to the law, constitution and rule.”
(C. 114-15.) Finally, the circuit court- explained:
“[Kennedy] has no capacity to- defend himself and has no idea what needs to be done in order to prepare for trial. As this is a Capital Murder case in which forensics may be a critical factor, [Kennedy] is totally oblivious of what needs to be done regarding retaining experts, having samples tested, and preparing cross examination. As to mitigation ... [Kennedy,] once again, seems to take the attitude that he will take care of that later.”
(C. 115-16.) Applying the above-mentioned Tomlin factors to the circumstances of this casé, we conclude that the récord does not support the circuit court’s order revoking Kennedy’s right of self-representation.
The circuit court’s first stated circumstance — that Kennedy did not “understand either intellectually or mentally” the disadvantages, he faced by not having counsel— is not supported by the, record. Indeed, the record, on appeal demonstrates that Kennedy can “read, write, and understand the English language” (C. 90); -that Kennedy graduated from a private high school; and that Kennedy attended the University of Mississippi for two years. Additionally, Kennedy worked with his father installing satellite dishes, which the circuit court described as a “technical job .... it’s not just plugging stuff in” (R. 36), and he knew some computer programming. Moreover, according to the circuit court, Kennedy is a “well-spoken fellow” (C. 29), and an “above average intelligent person.” (R. 36.)
The record also demonstrates that the circuit court engaged Kennedy in a lengthy colloquy that consisted of more than “pro forma answers to pro forma questions.” Tomlin, 601 So.‘2d at 129. Indeed, the circuit court’s colloquy with Kennedy was pérsonal and more than adequately explained to Kennedy the dangers and disadvantages of self-representation. Specifically, the circuit court advised Kennedy that he was in a “bad situation” and that he should not attempt to represent himself if he wanted to “win,” even going so far as analogizing Kennedy’s decision to represent himself at trial to a “suicide mission.”
Although the circuit court’s order revoking Kennedy’s right of self-representation *525 found that Kennedy did not understand that his incarceration “pose[d] an almost insurmountable handicap in that he could not perform the functions necessary for his defense” (C. 114), nothing in the record on appeal suggests that Kennedy was not aware that, when he waived his right to counsel, it would be difficult for him to review discovery, to interview witnesses, or to hire experts for his defense. In fact, the circuit court, on several different occasions, explained these difficulties to Kennedy at length, and Kennedy consistently indicated he understood these difficulties.
Moreover, the record indicates that Kennedy had in fact reviewed the discovery provided to him and that he was aware that it would be difficult to contact witnesses. Specifically, at the hearihg at which the circuit court appointed Darley as Kennedy’s “shadow counsel,” Kennedy informed the circuit court that, at that time, he had decided not to hire expert witnesses based on his reading of the discovery. After that hearing, Kennedy wrote á letter to the circuit court asking the circuit court to appoint his sister, Verlisa, as co-counsel. In that letter; Kennedy explained to the circuit court that he “completely understood the argument [the circuit court] made referencing the fact that he needed soméone to accomplish certain tasks1 outside of these bars” and that he trusted only his sister to accomplish those tasks.[10] The circuit court correctly denied Kennedy’s motion to appoint Verlisa as his cocounsel and, in doing so, advised Kennedy that Verlisa could, help him contact expert witnesses. Kennedy heeded that advice and told the circuit court at a later hearing that he “already had [his] sister call a couple of people.” (R. 109.) Thus, contrary to tile circuit court’s assertion, the record on appeal demonstrates that Kennedy was . aware of the dangers and disadvantages of self-representation and that his incarceration would pose a .significant hurdle to the preparation of his defense.[11] Kennedy’s understanding of these issues is bolstered by his background and education, his “above average” intelligence, and Dr. McKeown’s finding as to Kennedy of “no indication of a lack of capacity for appropriate' decision making.”[12] (C. 87.)
*526 With regard- to the second stated circumstance in the circuit court’s order— that Kennedy did not knowingly, intelligently, and voluntarily waive his right to counsel because, it found, Kennedy had asked the circuit court for “legal advice,” had asked “practical advice such as what type of expert he should hire,” and had asked “that ‘non-lawyers’ such as his sister serve as his counsel” — that stated circumstance is not supported by the record on appeal. •
In fact, although the circuit court found that Kennedy had asked the circuit court for “legal advice” and for “practical advice such as what type of expert to hire,” the record on appeal does not include any instance in which Kennedy either asked the circuit court for specific legal advice or asked the circuit court what type of expert he should hire. The State, in its brief on appeal, appears to point to Kennedy’s request for legal material as the equivalent of Kennedy asking for legal advice. A request for legal material, however, is not the equivalent of asking for legal advice. Indeed, it is difficult to fault Kennedy for asking the circuit court for specific, relevant legal material when the circuit court sua sponte provided Kennedy with a copy of both the Alabama Criminal Code — earmarking for him the specific Code 'section under which he was charged — and a copy of the Alabama Rules of Court. Additionally, although the circuit court and Kennedy discussed the necessity of hiring expert witnesses for his defense and the circuit court cautioned Kennedy that it would not recommend to him an expert-to hire, at no point in the 10 months that Kennedy was representing himself did he ask the circuit court to recommend an expert to hire.
The record on appeal does, however, support the circuit court’s finding that Kennedy asked the circuit court for a “nonlawyer” to serve as his cocounsel, and that, after his request was denied, Kennedy filed a letter with the circuit court asking where the rule that precludes non-lawyers from serving as counsel could be found. Kennedy’s request and his subsequent letter asking for clarification, however, do not demonstrate that he did not knowingly, intelligently, and voluntarily waive his right to counsel. Rather, Kennedy’s request for a nonlawyer to be appointed to serve as coeounsel was his acknowledgment that he would need some “outside” help, and his letter asking the circuit court where he could find the rule that precludes nonlawyers from serving as cocounsel was merely seeking a clarification. of the circuit court’s ruling. Thus, contrary to the circuit court’s findings, Kennedy did not ask the circuit court for either legal advice or practical advice. Additionally, Kennedy’s request for his sister to serve as cocounsel does not demonstrate that he did not knowingly, intelligently, and voluntarily waive his right to counsel.[13]
- As to the final stated circumstance in the circuit court’s order revoking Kennedy’s right of self-representation — that Kennedy “has no capacity to defend him *527 self and has no idea what needs to be done in order to prepare for trial” — that stated circumstance is not a.valid basis.on,.which to deny a defendant the right of self-representation. As set out above, the circuit court’s finding in this regard was based on the circuit court’s assessment that
“this is a Capital Murder ease in which forensics may be a critical .factor, [Kennedy] is totally oblivious of what needs to be done regarding retaining experts, having samples tested, and preparing cross examination. As to mitigation ... [Kennedy,] once again, .seems to take the attitude that he will take care of that later.”
(C. 115-16.)
Although the circuit court may have had legitimate concerns that, in a case in which the State was seeking to impose the death penalty, Kennedy had been ' taking a “wait-and-see” approach and, in the circuit court’s estimation, had not adequately reviewed discovery and had not adequately prepared his defense, a pro se defendant’s failure to adequately review discovery or to develop an “adequate” defense strategy is not a proper ground on which to deny a defendant the right of self-representation... See generally Ford v. State, 515 So.2d 34, 41 (Ala.Crim.App.1986) (“The fact that the defendant made no objections or motions, presented no defense, or otherwise participated in a ‘lawyer-like’ capacity at trial does not lead to the conclusion that he was mentally incapable of waiving his right to counsel. The defendant’s legal expertise was irrelevant.”). Indeed, Faretta is clear:
“The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage.
And although he may conduct his own defense ultimately to his own detriment’, his choice nmst he honored out of' ‘that respect for the,individual which is the lifeblood of the law.! Illinois v. Allen, 397 U.S. 337, 350-351 (Brennan, J., concurring).”
422 U.S. at 834 (footnotes omitted; emphasis added). Thus, when a defendant who represents himself at trial chooses a poor trial strategy, he does so,only to his detriment and he alone bears the “consequences of a conviction.” Faretta, 422 U.S. at 834. Consequently, the third stated reason in the circuit court’s order is not a justifiable basis on which to. deny Kennedy the right of self-representation.
Although the circuit court’s stated reasons are either not supported by the record or do not provide a proper basis on which to deny the right of self-representation, the State argués in its brief on appeal additional circumstances, which were not addressed by the' circuit court in its order, that, the State argues, indicate that Kennedy did not knowingly, intelligently, and voluntarily waive his right to counsel. Specifically, the State contends that there was no indication that Kennedy had any previous involvement in criminal trials and that Kennedy “did not want to utilize [‘shadow counsel’] for the assistance he was seeking from the [circuit] court.” (State’s' brief, p. 22.)
With regard to the latter claim, Kennedy’s unwillingness to consult “shadow counsel” does not lead to the conclusion that he did not knowingly, intelligently, and voluntarily waive his right to counsel. Indeed, it would be illogical to conclude that Kennedy could both forgo the right to counsel and be required, at the same time, to consult with appointed standby counsel, *528 whom the circuit court appointed to Kennedy over his objection.[14] See, e.g., United States v. Flewitt, 874 F.2d 669, 676 (9th Cir.1989) (“It indeed would be a paradox to justify revoking a defendant’s pro se status on the basis that the defendant failed to consult counsel.”). Thus, circuit court’s appointment of “shadow counsel” to Kennedy and Kennedy’s decision to not communicate with “shadow counsel” do not lead to the conclusion that Kennedy did not knowingly, intelligently, and voluntarily waive his right to counsel.
The State’s contention that Kennedy had no previous involvement in criminal trials, likewise, does not lead to the conclusion that Kennedy did not knowingly, intelligently, and voluntarily waive his right to counsel. Although “previous involvement in criminal trials” is certainly a factor courts consider .when assessing the totality of the circumstances of a defendant’s waiver of the right to counsel, that factor standing alone does not justify a circuit court’s decision to not allow a defendant the right to represent himself at trial. Indeed, if that factor alone could preclude a defendant from representing himself at trial, any defendant who encounters the criminal justice system for the first time would be unable to represent himself at trial. ■ Such a result is inconsistent with Faretta and the right of self-representation; Moreover, the State’s assertion in this regard is incorrect. Although the record is unclear as to whether Kennedy had participated in a criminal jury trial,'the record clearly establishes that Kennedy had been previously charged with indecent exposure and had been acquitted of that offense. Thus, Kennedy clearly had had “previous involvement” with the criminal justice system.[15] Consequently, this factor also points in favor of Kennedy having knowingly, intelligently, and voluntarily waived his right to counsel.[16]

Conclusion

. Accordingly, the totality of the circumstances in this case indicates that Kennedy knowingly, intelligently, and voluntarily waived his right to counsel and that the circuit court abused its discretion .when it revoked Kennedy’s right of self-representation and appointed counsel to him. Because the record on appeal supports Kennedy’s claim, Kenned/s conviction for capital murder and his resulting sentence of death are reversed, and this case is re *529 manded to the circuit court for that court to conduct further proceedings at which Kennedy should be permitted to represent himself.[17]
REVERSED AND REMANDED.
WINDOM, P.J., and WELCH, KEL-LUM, and BURKE, JJ., concur.

. This issue is presented as Issue I in Kennedy’s brief on appeal and is preserved for appellate review.

. After Kennedy's arraignment, Kennedy’s counsel filed a motion to withdraw; the circuit court granted that motion.

, The circuit court later appointed a second lawyer, Art Powell, to also represent Kennedy at trial.

. According to his counsel, Kennedy also refused to meet with a mitigation expert whom his counsel had retained for use during the penalty phase of trial.

. Kennedy raises several issues on appeal. Because this issue is dispositive of Kennedy's appeal, however, it is unnecessary to address Kennedy’s remaining issues.

. Art. I, § 6, Ala. Const. 1901 (Official Re-comp.), provides, in relevant part, "[t]hat in all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either.”

. At least two additional limitations have been recognized by other courts. The first limitation was addressed by the United States Supreme Court in Indiana v. Edwards, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008). In that case, the United States Supreme Court held that "the Constitution permits judges to take a realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under Dusky [v. United States, 362 U.S. 402 (1960),] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.” 554 U.S, at 177-78. .Since Edwards was .decided, however, neither this Court nor the Alabama Supreme Court have decided whether the State of Alabama "permits judges” to limit the right of self-representation in such a manner. Neither party in this case, however, asks this Court to address this question, which would be an issue of first impression. Moreover, it would be inappropriate for this Court to address this issue sua sponte for at least three reasons.
First, the circuit court’s order, although referencing “mental deterioration” arid a "lack of capacity,” does not explicitly find that Kennedy was suffering from a severe mental illness to the point where he would be incapable of representing himself at trial; rather, the circuit court concluded that Kennedy had not knowingly, intelligently, and voluntarily waived.his right to counsel. Second, as set out above, the State in its brief on appeal does not ask this Court to read the circuit court’s order as applying the Edwards limitation, nor does Kennedy ask this Court to limit the reach of Edwards in Alabama. Third, even if the State did ask this Court to read the circuit court’s order in such a manner, the record on appeal clearly demonstrates that Kennedy was not suffering from any mental disease or defect much less a severe mental disease or defect — which was the issue in Edwards. Thus, although we recognize that state courts have, under certain circumstances, applied the holding in Edwards to limit a defendant’s ability to represent himself at trial, we have not been asked to apply such a limitation in this case and we express no opinion as to whether we would recognize that limitation.
A second limitation was addressed by the United States Supreme Court in Martinez v. Court of Appeal of California, 528 U.S. 152, 158, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000), and involved the issue of self-representation on appeal — not at trial. In that case, the Court recognized that the holding in Faretta is "confined to the right to defend oneself at trial,” Martinez, 528 U.S. at 154 (emphasis added),, and does not ”require[] [states] to recognize a constitutional right to self-representation on direct appeal from a criminal *522 conviction.” Id. at 163’ (emphasis added). The Court recognized, however, that the holding in Martinez is "narrow” and explained that States may "recogniz[e] a constitutional right to appellate self-representation under their own constitutions.” Id.. Because this case involves the denial of Kennedy’s request for self-representation at trial and not on appeal, there is no need to address the limitation of the right to self-representation on appeal in this case. After Martinez, the Alabama Supreme Court determined that, although "an appellant in a criminal case does not have a constitutional right to represent himself on a direct appeal, he does have a statutory right to do so.” ’ See Ex parte Scudder, 789 So.2d 837, 841 (2001).

. The State concedes in its brief on appeal that Kennedy "consistently asserted his wish to represent himself,” (State’s brief, p. 20.) Additionally, there is no dispute that Kennedy invoked his right of self-representation in a timely manner.

. The record on appeal demonstrates that Kennedy appeared to be both cooperative with and respectful of the circuit court. Although, as set out above, Kennedy did eventually exhibit arguably recalcitrant behavior, that behavior occurred only after the circuit court had revoked Kennedy’s right of self- - representation and had forced him to cooperate with his appointed counsel.

. In Faretta, the United Stats Supreme Court explained that forcing counsel on a defendant who desires to represent himself has the effect of “leadfing] [that defendant] to believe that the law contrives against him.” 422 U.S. at 834. Here, because Kennedy had an inherent distrust of court-appointed attorneys, the circuit court's decision to force a lawyer on him put Kennedy in a position of believing that "the law contrives against him.”

. Kennedy argues in his brief on appeal that the circuit court’s decision to deny him the right of self-representation is inconsistent with the circuit court’s decision to allow him to waive all mitigation evidence during the penalty phase of his trial. Specifically, Kennedy contends that, in allowing him to waive all mitigation evidence, the circuit court "effectively allowed [him] to represent himself in the penalty phase by preventing his lawyers from taking part.” (Kennedy’s brief, p. -29.) Although we have previously recognized that a defendant who is "competent to represent himself in the proceedings ... [is] also competent to waive the presentation of mitigating evidence,” Nelson v. State, 681 So.2d 252, 255-56 (Ala.Crim.App.1995), because we conclude that the circuit court’s decision to revoke Kennedy’s right to represent himself was an abuse of discretion for other reasons, it is unnecessary. for us to. address whether the decision to deny Kennedy the right of self-representation and the decision to allow Kennedy to' waive all mitigation evidence are, in fact, inconsistent.

. Indeed, although questions involving the waiver of the right to counsel depend "upon the particular facts and circumstances surrounding [each] case, including the background, experience and conduct of the accused,” Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), this Court has - previously found a defendant to have understood the right to waive represen *526 tation by counsel where that defendant had an- I.Q; of 80, was only 19 years old, and had completed only the ninth grade—circumstances that fall far below Kennedy’s background and education. See Ford v. State, 515 So.2d 34 (Ala.Crim.App.1986).

. Kennedy’s request for a nonlawyer to serve as cocounsel and his subsequent request for clarifícation of the circuit court’s ruling indicates, at worst, a lack of legal acumen, which, as discussed below, does nbt invalidate a defendant’s knowing, intelligent, and voluntary waiver of the right to counsel. See, e.g., Anderson v. State, 964 So.2d 86, 91 (Ala.Crim. App.2007) (holding that "experience and skill in the legal system are not necessary to represent [one’s] self” at trial).

. Although there is no constitutional right to standby counsel, see Lucas v. State, 645 So.2d 333, 334 (Ala.Crim.App. 1994), Rule 6.1(b), Ala. R.Crim. P., allows a circuit court to appoint standby counsel to a pro se defendant.

. Even if we were to agree with the State’s argument with regard to the previous-involvement-in-trial factor, we would still conclude that Kennedy knowingly, voluntarily, and intelligently waived his right to counsel because, as set out above, “ ‘ ”[a]ll factors need . not point in the same direction.” ’ ” Johnson v. State, 40 So.3d at 757-58 (quoting Sibley v. State, 775 So.2d at 243, quoting in turn United States v. Cash, 47 F.3d at 1089).

.The State also argues on appeal that "had [the circuit court] allowed Kennedy to represent himsélf, his persistence in requesting legal assistance from the [circuit] court would have supported a claim on appeal that his waiver had not been knowingly and intelligently made." (State’s brief, p. 24.) This hypothetical situation, however, is not before this Court on appeal. Because we conclude, however, that Kennedy knowingly, intelligently, and voluntarily waived his right to counsel and that the circuit court abused its discretion when it denied Kennedy the right of self-representation, we would, if faced with the hypothetical question the State presents, also conclude that Kennedy made a knowing and voluntary waiver of his right to counsel.

. To be clear, because the error in this case is predicated on the circuit court’s failure to allow Kennedy to represent himself at trial, once the certificate of judgment issues in this appeal and jurisdiction of this case moves back to the circuit court, Kennedy is acting as his own counsel.