WINDOM, Judge.
 

 Christopher Thomas Johnson appeals his guilty-plea conviction for capital murder, § 13A-5-40(a)(15), Ala.Code 1975 (murder of an individual under the age of 14), and his sentence of death. Johnson’s appeal is before this court in an unusual procedural posture that must be explained before this court turns to the merits of his appeal.
 

 On October 28, 2005, Johnson was indicted by an Escambia County grand jury on the charge of capital murder for the death of his six-month-old son, Elias Ocean Johnson. J. Todd Sterns and Charles E. Johns were appointed to represent Johnson. Johnson’s trial began on December 4, 2006. (R. 267.) After both sides had rested their cases and during the jury charge conference, Johnson invoked his right to represent himself and moved the circuit court to allow him to reopen his case and to testify. (R. 1418-40.) The circuit court conducted a thorough colloquy pursuant to Rule 6.1(b), Ala. R.Crim. P., and
 
 Faretta v. California,
 
 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), to determine whether Johnson knew the consequences and dangers of representing himself and to ensure that Johnson’s decision was knowing and voluntary. (R. 1418-40.) After determining that Johnson’s decision to represent himself was knowing and voluntary, the circuit court granted Johnson’s motion to represent himself and ordered counsel to remain as standby counsel.
 

 The circuit court then allowed Johnson to reopen his case and to testify on his own behalf. (R. 1444.) Johnson testified that he intentionally murdered his six-month-old son because he hated his wife. (R. 1452.) After testifying, Johnson moved the circuit court to allow him to change his plea from not guilty to guilty. (R. 1456.) The circuit court then engaged Johnson in a thorough colloquy, as required under
 
 Boykin v. Alabama,
 
 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and Rule 14.4, Ala. R.Crim. P., during which the circuit court informed Johnson of the rights he would be waiving by pleading guilty and questioned Johnson to ensure that his decision was knowing and voluntary. (R.
 
 *756
 
 1457-62.) After determining that Johnson’s decision was knowing and voluntary and not the result of any coercion, threats, or promises, the circuit court allowed Johnson to plead guilty to capital murder. (R. 1462.) The cause was then submitted to the jury in accordance with § 13A-5-42, Ala.Code 1975, and the jury found Johnson guilty of capital murder. § 13A-5-40(a)(15), Ala.Code 1975.
 

 Following the jury’s verdict, the penalty phase of Johnson’s trial began. The State submitted that the aggravating circumstance of the offense (Elias’s murder) was especially heinous, atrocious, or cruel, § 13A-5-49(8), Ala.Code 1975, and adopted the evidence presented during the guilt phase. Johnson, representing himself, presented no evidence in mitigation and urged the jury to recommend a sentence of death. (R. 1502, 1509.) After the circuit court properly instructed the jury regarding the penalty-phase process of weighing the aggravating circumstances and the mitigating circumstances, the jury unanimously recommended that Johnson be sentenced to death. (R. 1532.) The circuit court accepted the jury’s recommendation and sentenced Johnson to death. (C.R. 2017-2029, R. 1585.)
 

 After being sentenced to death, Johnson invoked his state-law right to represent himself on appeal, and he refused to file a notice of appeal.
 
 See Ex parte Scudder,
 
 789 So.2d 837, 841 (Ala.2001) (holding that, “taken together, §§ 12-22-130 and 15-12-22(b) confer upon a defendant in a criminal case the right to represent himself on appeal if he desires to do so”). On February 21, 2007, the circuit court entered an order of appeal pursuant to § 12-22-150, Ala. Code 1975, and Johnson’s case was appealed to this court for automatic review. § 13A-5-55, Ala.Code 1975.
 

 On February 27, 2007, this court remanded the cause to the circuit court with instructions that the circuit court hold a hearing during which it was to advise Johnson of the disadvantages of self-representation on appeal and the consequences of his failure to file an appellate brief. The circuit court was further ordered to determine whether Johnson had knowingly and voluntarily waived his right to counsel on appeal and whether he understood the consequences of failing to file a brief on appeal.
 
 See Sibley v. State,
 
 775 So.2d 235, 237-40 (Ala.Crim.App.1996).
 

 On March 26, 2007, the circuit court conducted a hearing in accordance with this court’s instructions. During the hearing, the circuit court thoroughly informed Johnson of the disadvantages and consequences of his self representation and the refusal to file an appellate brief. (R. 1591— 99.) The circuit court determined that Johnson’s decisions were knowing and voluntary and not the result of any coercion, threats, or promises. (C.R. 2037-38.)
 

 Although Johnson has chosen not to file an appellate brief on his behalf, his decision not to do so does not end this court’s review. Because Johnson was convicted of a capital crime and was sentenced to death, his appeal is automatic, and this court must review the propriety of his decision to waive his right to present a brief on appeal, the sufficiency of the evidence to sustain his conviction, and the propriety of his sentence of death. §§ 12-22-150, 13A-5-53, and 13A-5-55, Ala.Code 1975; Rule 45A Ala. R.App. P.
 
 See also Sibley v. State,
 
 775 So.2d 235, 240 (Ala.Crim.App.1996);
 
 Block v. State,
 
 744 So.2d 404, 406 (Ala.Crim.App.1996).
 

 I.
 

 First, this court must review the circuit court’s finding that Johnson’s decision to represent himself on appeal and his waiver of appellate counsel was knowing and voluntary.
 
 Sibley v. State,
 
 775 So.2d 235, 240
 
 *757
 
 (Ala.Crim.App.1996);
 
 Block v. State,
 
 744 So.2d 404, 406 (Ala.Crim.App.1996). This court must also review whether Johnson’s decision to forgo filing a brief on appeal was knowing and voluntary.
 
 Id.
 

 In
 
 Faretta v. California,
 
 422 U.S. 806, 819-22, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the United States Supreme Court explained that although a defendant has a right to represent himself and waive the assistance of counsel, the intelligence of the waiver of counsel must be scrutinized.
 
 [1]
 
 “When an [appellant] manages his own [appeal], he relinquishes ... many of the traditional benefits associated with the right to counsel.”
 
 Id.
 
 at 835, 95 S.Ct. 2525. Because an appellant who invokes his state-law right to represent himself and refuses to file a brief on his own behalf waives many traditional benefits, “in order to represent himself the [appellant] must ‘knowingly and intelligently’ forgo those relinquished benefits .. [and] he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that ‘he knows what he’s doing and his choice is made with eyes open.’ ”
 
 Sibley,
 
 775 So.2d at 242-43 (quoting
 
 Faretta,
 
 422 U.S. at 835, 95 S.Ct. 2525). “While it is desirable that the trial court engage, as it did in this case, in a colloquy in which it expressly advises the defendant of ‘the dangers and disadvantages of self-representation,’ such a colloquy is not mandated.”
 
 Moody v. State,
 
 888 So.2d 532, 554 (Ala.Crim.App.2003) (quoting
 
 Tomlin v. State,
 
 601 So.2d 124, 128 (Ala.1991)). “The ultimate test is whether it ‘appear[s] from the record as a whole that a defendant’s waiver of counsel and decision to represent himself were knowing and intelligent.’”
 
 Moody,
 
 888 So.2d at 554 (quoting
 
 Teske v. State,
 
 507 So.2d 569, 571 (Ala.Crim.App.1987)). “Under this approach, the focus of the inquiry is on ‘the particular facts and circumstances involved, “including the background, experience, and conduct of the accused.”’”
 
 Moody,
 
 888 So.2d at 554 (quoting
 
 Tomlin,
 
 601 So.2d at 128-29, quoting in turn,
 
 Johnson v. Zerbst,
 
 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).
 

 In
 
 Sibley v. State,
 
 this court held that the circuit court may consider the following factors in determining whether an appellant’s decision to represent himself and refusal to file a brief was knowing and voluntary:
 

 “(1) the background, experience and conduct of the defendant including his age, educational background, and his physical and mental health; (2) the extent to which the defendant had contact with lawyers prior to the trial; (3) the defendant’s knowledge of the nature of the charges, the possible defenses, and the possible penalty; (4) the defendant’s understanding of the rules of procedure, evidence and courtroom decorum; (5) the defendant’s experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which he aided the defendant; (7) whether the waiver of counsel was the result of mistreatment or coercion; or (8) whether the defendant was trying to manipulate the events of the trial.”
 

 775 So.2d at 239 (quoting
 
 Strozier v. Newsome,
 
 871 F.2d 995, 998 (11th Cir.1989)).
 
 See also United States v. Cash,
 
 47 F.3d 1083, 1088-89 (11th Cir.1995) (same factors). “ ‘All factors need not point in the
 
 *758
 
 same direction.’ ”
 
 Sibley,
 
 775 So.2d at 243 (quoting
 
 Cash,
 
 47 F.3d at 1089).
 

 After reviewing the record on return to remand, this court is convinced that Johnson’s decision to represent himself on appeal and his decision not to file an appellate brief on his own behalf was knowing and voluntary. During the hearing on Johnson’s decision to represent himself, Johnson adamantly insisted that he desired to represent himself on appeal and that he would not file a brief. (R. 1591-93.) The record reflects that Johnson was 34 years old when he invoked his right to represent himself on appeal. (R. 1605.) Although Johnson did not graduate from high school, he obtained his GED certificate, is intelligent, and has experience with the criminal judicial process. (C.R. 2026 (noting that Johnson’s IQ is 127); R. 1606.) Johnson told the circuit court that he did not have any physical or mental-health problems and that he was not taking any medications. (R. 1599.) Johnson further informed the court that he understood that he had been convicted of capital murder and had been sentenced to death. (R. 1606.) Johnson also informed the court that he had not been coerced or forced to represent himself and that it was his decision not to file an appellate brief on his own behalf. (R. 1606-07).
 

 During the colloquy, the circuit court informed Johnson that he has a right to counsel on appeal. (R. 1591.) The circuit court further explained to Johnson the disadvantages and dangers of self-representation and the failure to file a brief. (R. 1591-96.) The circuit court informed Johnson that his decision to represent himself and his refusal to file a brief on appeal would result in waiving claims of ineffective assistance of appellate counsel and future postconviction claims. (R. 1591-98, 1604.) The circuit court also warned Johnson that representing himself and forgoing filing a brief would place Johnson at a great disadvantage. (R. 1591-98, 1604.) Johnson informed the circuit court that he understood that his decision to represent himself and his refusal to file a brief would place him at a disadvantage on appeal and would make it “more likely that [he] will get the death sentence.” (R. 1604.) Johnson, however, insisted that he desired to represent himself and that he would not file a brief. (R. 1591,1600,1606-07.)
 

 Based on the extensive colloquy between the circuit court and Johnson, this court is convinced that Johnson “not only knowingly, intelligently, and voluntarily, waived his right to counsel, but also his right to present issues to this court as it i'eviews his conviction and his sentence of death.”
 
 Sibley v. State,
 
 775 So.2d 235, 243 (Ala.Crim.App.1996). This court is further convinced that when Johnson “decided to forgo presentation of any issues in the review of his conviction and death sentence he could appreciate his position and he knew that his life was at stake.”
 
 Id.
 
 at 244. Therefore, there was no error in allowing Johnson to represent himself on appeal.
 

 II.
 

 Next, this court must review the sufficiency of the State’s evidence to sustain Johnson’s guilty-plea conviction. In Alabama, “[a] defendant who is indicted for a capital offense may plead guilty to it, but the state must in any event prove the defendant’s guilt of the capital offense beyond a reasonable doubt to a jury.” § 13A-5-42, Ala.Code 1975. Johnson pleaded guilty to and was convicted of capital murder pursuant § 13A-5-40(a)(15), Ala.Code 1975, which required a showing that he intentionally murdered a child who was under 14 years of age.
 
 MacEwan v. State,
 
 701 So.2d 66, 70 (Ala.Crim.App.1997).
 

 
 *759
 
 “In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.”
 
 Powe v. State,
 
 597 So.2d 721, 724 (Ala.1991) (citing
 
 Faircloth, v. State,
 
 471 So.2d 485 (Ala. Crim.App.1984)). ‘“The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.’ ”
 
 Nunn v. State,
 
 697 So.2d 497, 498 (Ala.Crim.App.1997) (quoting
 
 O’Neal v. State,
 
 602 So.2d 462, 464 (Ala.Crim.App.1992)). “When there is legal evidence from which the jury could, by fair inference, find the defendant guilty the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.”
 
 Sale v. State,
 
 8 So.3d 330, 338 (Ala.Crim.App.2008) (quotations and citations omitted). “The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.”
 
 Ex parte Stewart,
 
 900 So.2d 475, 477 (Ala. 2004) (citations and quotations omitted). Further, in a capital case in which the defendant pleads guilty, “[t]he guilty plea may be considered in determining whether the state has met [its] burden of proof.” § 13A-5-42, Ala. Code 1975. Applying these principles, this court finds that the State presented sufficient evidence to prove Johnson’s guilt.
 

 At trial, the State established that Johnson’s wife, Dana, gave birth to their son, Elias Ocean Johnson, on August 22, 2004. (R. 1119.) In February 2005, the John-sons lived in a duplex at 103 Horner Street in Atmore, Alabama.
 

 On February 19, 2005, Suzanne Mims and Jason Mims, along with their infant, Sophie, arrived at the Johnsons’ duplex around 8:30 p.m. to play board games. (R. 1100, 1122-23.) While playing board games, the Johnsons and the Mims drank alcoholic beverages. (R. 1096-1100, 1123.) At approximately 1:00 a.m., the Mims left the duplex to go home. (R. 1100.) Shortly thereafter, at 1:30 a.m., Dana went to bed, leaving Elias in Johnson’s care. (R. 1125.) Not long after Dana went to bed, Elias became hungry so Dana got back up to help feed him. (R. 1142-43.) After warming a bottle for Johnson to feed Elias, Dana went back to bed, again leaving Elias in Johnson’s care. (R. 1143.)
 

 At around 9:00 a.m., Dana woke up and found Johnson and Elias on the couch in the duplex. (R. 1129-30.) Dana stated that Elias had bruises on him and that he appeared to be dead. (R. 1131.) At that point, Dana ran over to feel Elias. (R. 1131.) Dana testified that Elias felt cool so she tried to check his pulse; however, she could not find one. (R. 1131.) Worried about Elias, Dana grabbed the telephone and called emergency 911. (R. 1131.)
 

 Tim Grabill, a paramedic with Atmore Ambulance Service, received a call to go to the Johnsons’ duplex. (R. 1018.) When Grabill and his partner, Jareth Heibert, arrived at the duplex, Johnson was holding Elias. (R. 1018.) Grabill observed that Elias was “very pale, limp and his extremities were cool to the touch.” (R. 1018.) Based on Elias’s appearance, Heibert carried him to the ambulance where the paramedics checked his vital signs. (R. 1018-21.) At that point, Elias was not breathing and had no heartbeat. (R. 1020-21.) Although Grabill believed that Elias was already dead, he performed CPR and rushed Elias to the emergency room at
 
 *760
 
 Atmore Hospital. (R. 1020-23, 1025.) When they arrived at the hospital, Grabill carried Elias into the emergency room, still performing CPR, placed him on a trauma bed, and turned him over to Dr. Steven Michael Sharp. (R. 1023, 1028.)
 

 Dr. Sharp testified that Elias appeared to be dead when he arrived at the hospital. (R. 1033.) Dr. Sharp described several injuries he observed on Elias’s body. (R. 1044.) Specifically, Dr. Sharp noticed several bruises on Elias’s face, a bruise on the bridge of Elias’s nose, and ruptured blood vessels around Elias’s eyes and chin. (R. 1044.) Dr. Sharp also noticed a bite mark on one of Elias’s arms. (R. 1044).
 

 Although Elias appeared to be dead, the hospital staff attempted to resuscitate him. (R. 1033.) Because Elias was unresponsive, Dr. Sharp cleared his airway and placed an endotracheal tube in his throat so that medical personnel “could breath for the child.” (R. 1036.) While attempting to place the endotracheal tube, Dr. Sharp noticed blood in Elias’s mouth. (R. 1036.) Dr. Sharp also testified that Elias had blood in his stomach. (R. 1037-39.) After all attempts to resuscitate Elias failed, he was pronounced dead. (R. 1038.)
 

 Investigator Chuck Brooks and Police Chief Jason Dean, with the Atmore Police Department, went to Atmore Hospital to investigate the circumstances of Elias’s death. (R. 1076, 1156.) One of the law-enforcement officers asked Johnson and Dana to come to the police station and give statements relating to the death of their child. (R. 1157.) Dana rode to the police station with a member of her church, and Johnson rode to the police station with Chief Dean. (R. 1158.) During the ride to the police station, Johnson spontaneously stated that he had something to do with Elias’s death. (R. 1159.)
 

 Once at the police station, Johnson gave a statement to Investigator Brooks and Irene Johnson, a social worker with the Alabama Department of Human Resources. (R. 1085, 1165-66.) After being informed of and waiving his Miranda
 
 [2]
 
 rights, Johnson indicated that Elias had been crying so Johnson laid on top of him to try to quiet the child. (R. 1189.) When Elias did not stop crying, Johnson stuck his fingers in the child’s mouth and hit him. (R. 1190-93.) Johnson stated that “[l]ast night was the hardest that [he] ever hit [Elias and he was] pretty sure [Elias’s death was his] fault.” (R. 1195.) Johnson also stated that after the event that night, he did not think that he had seriously injured Elias. (R. 1195.)
 

 Dr. Kathleen Entice, a medical examiner who was formerly with the Alabama Department of Forensic Sciences, performed the autopsy on Elias and testified that it would be reasonable to estimate that Elias had suffered 85 separate injuries, including a bite mark on his arm. (R. 1277, 1293.) Dr. Entice testified that Elias had multiple bruises on his face and head. (R. 1241-43.) She stated that both of Elias’s ears were swollen and bruised which was consistent with a “boxing blow” and squeezing. (R. 1246-49.) Dr. Entice testified that Elias’s lower lip was swollen and bloody from a blunt-force injury. (R. 1256.) Dr. Entice explained that Elias had three impact injuries to his forehead. (R. 1251.) She informed the jury that Elias’s ethmoid bone, which is in the sinuses, was broken and that Elias’s sinuses were full of blood. (R. 1252.) Dr. Entice testified that Elias had deep contusions on his head and that his brain had hemorrhaged as a result of blunt-force trauma. (R. 1263-67.) Dr. Entice also testified that Elias had hemorrhages in both eyes and had injuries to his
 
 *761
 
 inner lips and nose that indicated that he had been smothered by the “forceful covering, sealing off [of] his mouth and nose.” (R. 1289.) According to Dr. Entice, Elias’s injuries had been inflicted within 24 hours of his death.
 
 See
 
 (R. 1284.) Dr. Entice finally testified that in her opinion, Elias died as a result of blunt-force trauma and smothering.
 
 [3]
 
 (R. 1228-29,1294.)
 

 In addition to the State’s evidence, Johnson testified that he intentionally murdered his son because he hated his wife. (R. 1452.) Johnson explained that he would have left his wife long before the murder if it had not been for Elias. (R. 1452.) According to Johnson, he did not want “to worry about [his wife’s] threats of putting [him] in jail for alimony or child support ... so [he] intentionally inflicted wounds on [Elias] that caused [Elias’s] life [to expire].” (R. 1452.) Johnson stated that his final words to Elias were: “You go see Jesus.” (R. 1452.) Thereafter, Johnson pleaded guilty.
 

 The State’s evidence, coupled with Johnson’s guilty-plea and in-court confession, overwhelmingly established that Johnson intentionally murdered a person under the age of 14, a violation of § 13A-5-40(a)(15), Ala.Code 1975. Because the State met its burden of proof, Johnson is not entitled to any relief.
 

 III.
 

 Pursuant to § 13A-5-53, Ala.Code 1975, this court is required to address the propi’iety of Johnson’s convictions and his sentence of death. Johnson was indicted for, and convicted of, murder made capital because his victim was under the age of 14.
 
 See
 
 § 13A-5-40(a)(15), Ala.Code 1975. The State established, and Johnson did not eontest, that the murder was especially heinous, atrocious, or cruel.
 
 See
 
 § 13A-5-49 (8), Ala.Code 1975.
 

 The record does not reflect that Johnson’s sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor.
 
 See
 
 § 13A-5-53(b)(l), Ala.Code 1975.
 

 The circuit court correctly found that the aggravating circumstances outweighed the mitigating circumstances. In making this determination, the circuit court found that the State proved that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.
 
 See
 
 § 13A-5-49(8), Ala.Code 1975. The circuit court also found that no statutory mitigating circumstances existed.
 
 See
 
 § 13A-5-51, Ala.Code 1975. With regard to nonstatutory mitigating circumstances, the circuit court made the following findings:
 

 “In addition to the statutory mitigating circumstances specified in § 13A-5-51, the Court has considered additional mitigating circumstances pursuant to § 13A-5-52. The defendant was primarily reared by his mother as his father and mother were never married. He had sporadic contact with his father while he was growing up. The defendant has four half sisters, however, one of his sisters died in 1999 at the age of thirty-three. He has one half brother. His youth was spent primarily in North Carolina where he lived with his mother and stepfather James Johnson. The defendant reported that he was sexually molested by an uncle from the ages of seven through twelve. Although possessing an above average IQ (127 as
 
 *762
 
 determined by Dr. DeFranciseo), the defendant had behavioral problems during his adolescent years. During this time, he had psychiatric hospitalizations in North Carolina as a result of chronic suspensions from school and being disrespectful to teachers. He was given medications including Mellaril and Thorazine which are used for the treatment of severe behavioral disorders in children. There is an indication that the defendant had a history of running away from home. The defendant reported that he was first hospitalized for behavior and conduct issues when he was twelve years old. He had three hospitalizations at the State facility in Mor-ganton, North Carolina. Also, the defendant reported that at one time he was in a rehabilitation hospital in Fletcher, North Carolina and a reformatory type school. He also attended the Jack Eckerd Outdoor Wilderness Program. The defendant has reported that he began using alcohol at the age of twelve and began using it regularly at the age of sixteen through adulthood. The defendant moved out of his mother’s home when he was sixteen. Around the age of sixteen, the defendant reported that he began using prescription drugs, crack cocaine, powder cocaine, crystal methamphetamine and marijuana. He reports that he would drink up to two bottles of whiskey a day at times and he reports almost daily marijuana use up until December of 2004. He stated that he stopped drinking and using drugs due to the birth of his son and that he had not had any alcohol to drink for about three months until the day Elias Ocean Johnson was killed. From the pre-sentence report, it appears that the defendant completed the ninth grade but did not graduate from high school. Later, he obtained a GED. He met his future wife in June of 2003 in Tucson, Arizona. Both were homeless at the time. They eventually moved to Pensacola and when she became pregnant in November of 2003, they married. They moved from Pensacola to Walnut Hill and then to Atmore. He obtained a job at Swift Supply Company in June of 2004 where he would often work six days a week. He reports that he and his wife had a volatile relationship. The defendant had consumed alcohol on the night Elias was killed and he had at least four daiquiris with more than an average amount of rum per drink. When questioned about his son’s death, the defendant readily admitted his involvement and expressed remorse. When he gave his statement to Investigator Brooks, he did not believe that he had hurt Elias as seriously as it turned out. The defendant told Investigator Brooks that after laying on Elias, covering his mouth and putting his fingers down Elias’s throat to stop the crying, that Elias had laborious breathing like he had phlegm in his throat and Elias seemed to be alright from there; that he was breathing and calm and when Elias closed his eyes the defendant believed Elias was sleeping. It is reported that the defendant made a suicide attempt during his first weeks of incarceration by stuffing toilet paper in his nose and eating toilet paper. Both psychologists found that he suffered from personality disorder with anti-social features along with a history of polysubstance abuse including alcohol, crystal methamphetamine, prescription drugs, crack, powder cocaine and marijuana.
 

 “The Court has considered the defendant’s family history, turbulent childhood and behavioral problems as a child and teenager. The sexual abuse, lack of discipline and absence of a stable home environment during his formative years
 
 *763
 
 have been considered by the Court. Also, the Court has considered his chronic abuse of alcohol and drugs which commenced when he was a teenager and continued up until a few months before this offense. The Court has searched all of the evidence in the case for evidence of mitigation, whether or not raised by the defense, in view of the fact that this is a capital case. The Court has considered all non-statutory mitigating circumstances presented throughout this proceeding which involved any aspect of the defendant’s character or record and any of the circumstances of the offense.”
 

 (C.R. 2026-28.) After searching the record for all mitigating evidence, the circuit court found that the aggravating circumstance outweighed the mitigating circumstances and sentenced Johnson to death. The sentencing order shows that the circuit court properly weighed the aggravating circumstance and the mitigating circumstances and correctly sentenced Johnson to death. The record supports the circuit court’s decision.
 

 Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to reweigh the aggravating circumstance and the mitigating circumstances to determine whether Johnson’s sentence of death was proper. After independently weighing the aggravating and mitigating circumstances, this Court finds that Johnson’s death sentence is appropriate.
 

 As required by § 13A-5-53(b)(3), Ala.Code 1975, this Court must now determine whether Johnson’s sentence is excessive or disproportionate when compared to the penalties imposed in similar cases. Johnson was convicted of capital murder for intentionally causing the death of his six-month-old son, Elias Ocean Johnson.
 
 See
 
 § 13A-5-40 (a)(15), Ala.Code 1975. A sentence of death has been imposed for similar crimes throughout this State.
 
 See Brooks v. State,
 
 973 So.2d 380, 421 (Ala.Crim.App.2007);
 
 Blackmon v. State, 1
 
 So.3d 397, 421 (Ala.Crim.App.2005);
 
 Minor v. State,
 
 914 So.2d 372, 446 (Ala.Crim.App.2004);
 
 Ward v. State,
 
 814 So.2d 899, 924 (Ala.Crim.App.2000). Therefore, this court finds that the sentence was neither excessive nor disproportionate.
 

 Finally, this Court has searched the entire record for any plain error, i.e., error that may have adversely affected Johnson’s substantial rights. After thoroughly searching the entire record, this Court has not found any error that rises to the level of plain error.
 
 See
 
 Rule 45A, Ala. R.App. P.
 

 Accordingly, Johnson’s conviction and his sentence of death are affirmed.
 

 AFFIRMED.
 

 WISE, P.J., and WELCH, KELLUM, and MAIN, JJ., concur.
 

 [1]
 

 . This court recognizes that
 
 Faretta
 
 is not directly on point because that case involved a defendant’s right to represent himself at trial. 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562. However, in
 
 Sibley,
 
 this court analogized the waiver of counsel at trial and the waiver of counsel on appeal.
 

 [2]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).
 

 [3]
 

 . Dr. Entice testified that Elias’s injuries would have been painful and that Elias had swallowed blood indicating that he was alive during the abuse. (R. 1277-73, 1290.) Johnson's statement also indicates that Elias was alive and conscious during the abuse. (R. 1181-1210.)