Rel: March 27, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2025-2026

———————————————

## CR-2024-0290

———————————————

## Jeremy T. Williams

### v.

## State of Alabama

## Appeal from Russell Circuit Court
## (CC-22-210, CC-22-211, CC-22-212, CC-22-213, and CC-22-791)

WINDOM, Presiding Judge.

Jeremy T. Williams appeals his guilty-plea convictions for murder made capital because he intentionally caused the death K.H., who was less than 14 years of age, see § 13A-5-40(a)(15), Ala. Code 1975; for murder made capital because he intentionally caused the death of K.H.

during the course of a first-degree kidnapping, see § 13A-5-40(a)(1); for murder made capital because he intentionally caused the death of K.H. during a first-degree rape, see § 13A-5-40(a)(3); and for murder made capital because he intentionally caused the death of K.H. during a first-degree sodomy, see § 13A-5-40(a)(3), and his resulting sentence of death.[1]

On March 13, 2024, Williams filed a notice of his intent to plead guilty to the capital-murder charges as well as to various other offenses. At a hearing held on that date, the Russell Circuit Court, in accordance with Boykin v. Alabama, 395 U.S. 238 (1969), and Rule 14.4, Ala. R. Crim. P., informed Williams of the rights he would be waiving by pleading guilty and questioned him to ensure that his decision was knowing and voluntary. (R. 16-46.) After determining that Williams's

---

[1] Williams included on his notice of appeal case numbers related to his guilty plea convictions for first-degree sodomy, see § 13A-6-63(a)(3), Ala. Code 1975; for sexual abuse of a child less than 12 years old, see § 13A-6-69.1, Ala. Code 1975; production of obscene material, see § 13A-12-197, Ala. Code 1975; for abuse of a corpse, see § 13A-11-13, Ala. Code 1975; for first-degree human trafficking, see § 13A-6-152, Ala. Code 1975, and for conspiracy to commit first-degree human trafficking, see §§ 13A-4-3 and 13A-6-152, Ala. Code 1975. However, because Williams neither preserved nor reserved an issue for appeal before pleading guilty nor filed a written motion to withdraw his guilty pleas, he failed to invoke his limited right to appeal those convictions. See Ingram v. State, 882 So. 2d 374, 376-77 (Ala. Crim. App. 2003). Therefore, we dismiss this appeal insofar as it relates to those convictions.

decision was knowing and voluntary and not the result of any coercion, threats, or promises, the circuit court accepted Williams's guilty pleas. A jury trial was conducted on the capital-murder charges, see § 13A-5-42, Ala. Code 1975, after which the jury found Williams guilty of the charges of capital murder beyond a reasonable doubt. (R. 860-61.)

Following the jury's verdict, the penalty phase of Williams's trial began. Williams waived the jury's participation in his capital sentencing and waived his right to present evidence in mitigation. (R. 60-71.) See § 13A-5-44(c), Ala. Code 1975. At the sentencing phase, the circuit court sentenced Williams to death for his capital-murder convictions.

## Facts

On December 13, 2021, K.H., a five-year-old girl, was reported missing in Columbus, Georgia. Sergeant Ryan Vardman of the Columbus Police Department interviewed K.H.'s mother, Kristy Siple. Siple did not have legal custody of K.H., but K.H.'s father, who had been vested with sole custody, had left K.H. in Siple's care.[2] After his interview with Siple, Sgt. Vardman sought an interview with Williams, who was one of the last

---

[2] Siple lost custody of K.H. due to her substance-abuse issues. At the time of K.H.'s death, a juvenile court had in a place a noncontact order between Siple and K.H.

3

individuals to be seen with K.H. Sgt. Vardman, though, was unable to speak with Williams about her disappearance.

While researching Williams's background, Sgt. Vardman learned that, a few days earlier, an adult female had reported to law-enforcement officers that Williams had forcibly sodomized her. A detail from the report of that incident that Sgt. Vardman found of particular interest was that Williams was alleged to have stated to the victim that he had taught a five-year-old girl named "[K.]" how to perform oral sex and that he wanted the victim to perform oral sex on him like K. (R. 637, 647.) Sgt. Vardman surmised, albeit incorrectly,[3] that perhaps the victim had misheard Williams and that K. was K.H., who had a similar first name and was also five years old. Sgt. Vardman interviewed the victim and confirmed her statement. Sgt. Vardman then obtained an arrest warrant for Williams in the sodomy case as well as a search warrant for Williams's property in Columbus.

While executing the search warrant, Sgt. Vardman located a shed in the backyard. Inside was a child-sized foam chair and a peanut-butter sandwich that had a child-sized bite taken out of it. Williams's wife

---

[3] In fact, K. is Williams's oldest daughter.

arrived home during the search and asked about the purpose of the search. Sergeant Braden Dobbins spoke with her, and, with a "look of terror on her face," Williams's wife gave the Sgt. Dobbins the address of a duplex in Phenix City "where that child would be if [Williams] had done anything to her." (R. 642, 657.)

Around that time, officers with the Russell County Sheriff's Office located Williams at a motel in Phenix City and took him into custody. Inside his motel room, officers recovered electronic devices and drug paraphernalia. An interview with Williams, however, did not lead to the whereabouts of K.H.

Sgt. Dobbins and other officers traveled to the Phenix City address given to him by Williams's wife. The officers entered the empty duplex; in the basement, K.H.'s naked body was found under a tarp. Investigator Brad Evans of the Russell County Sheriff's Office described the horrific sight: "What did I see? A five-year-old little girl. Rigor mortis had obviously set in. Legs up, spread. Ligature marks around her wrists, around her throat, bruising on the face, bleeding from the vagina and anus. That's what I saw." (R. 728.)

5

A couple of weeks later, on Christmas night, Williams notified the detention staff at the Russell County Jail that he wanted to speak with Lieutenant Steve Johnson. Williams told Lt. Johnson that he "had been praying the night before" and wanted "to speak about similar crimes [to] get it off of his chest." (R. 678.)

During the interview, Williams told Lt. Johnson, among other things, about his daughter K. Williams "stated that he had sexually molested [K.] probably on a daily basis while they were [living in Alaska]" and that his abuse continued when the family relocated to Texas. (R. 683-84.) Williams admitted that the sexual abuse typically took the form of oral sex and that he had shown K. pornography to teach her how to do it. Williams also spoke of his addictions to cocaine and then, for the last several years, methamphetamine. The interview turned to victims following the family's move from Texas to Phenix City, and Williams admitted that he had molested other young girls, though he could not remember all of their names. They spoke specifically about K.H., and Lt. Johnson told Williams that a body had been found in a basement. Williams responded: "[W]ell, then, I did it." (R. 686.) Williams also asked if the body had been found under a tarp. Lt. Johnson confirmed that fact,

6

and Williams again acknowledged his guilt: "[W]ell, then, I did it, I remember that."

Williams told Lt. Johnson that he knew K.H.'s mother, Kristy Siple, through "a prostitute web page called Skip the Game." (R. 688.) Williams had a sexual relationship with Siple, and the two abused methamphetamine together. Williams stated that, on at least one occasion, he had been entrusted with Siple's children while Siple answered a prostitution call. This had surprised Williams, because he had already told Siple that he "liked to have sex with smaller kids." (R. 690.) Lt. Johnson asked about Williams's taking K.H., and Williams disclosed that he had done so with Siple's knowledge. In fact, he had haggled with Siple over a price for taking "[K.H.] with him for a little while [for] a little head, meaning oral sex." (R. 692-93.) The two settled on $2,500 for Williams's taking K.H. for one hour for "oral sex only." (R. 693.)[4]

Around 2:00 a.m. on December 13, Williams took K.H. to his house in Columbus. Eventually, though, he and K.H. were seen by Williams's

---

[4] Williams admitted to Lt. Johnson, though, that he had no money and never intended to pay Siple.

wife, who told him: "[Y]ou can't be here with her, you have to leave." (R. 694.) Williams left around 6:20 a.m., taking K.H. to the duplex in Phenix City. On the way, Williams showed K.H. pornography; according to Williams, K.H. stated, "'I'm not going to do this,' and [Williams] punched her in the head." (R. 696.) Williams parked on the side of the duplex so that his aunt, who lived across the street, would not know he was there.

Williams again showed pornography to K.H. Williams also smoked methamphetamine and made K.H. smoke it, too. Williams described for Lt. Johnson the sexual acts that he forced K.H. to perform, including oral, vaginal, and anal sex. The abuse lasted an hour to an hour and a half, and Williams characterized it as "very rageful and sexually driven." (R. 699.) Williams killed K.H. by choking her, and her death did not come quickly:

> "According to [Williams], it took 10 to 15 minutes for her to die. … [A]t one point … he thought she was dead, and he let go of her because his hands were tired. And he said, the baby, [K.H.] sat up and gasped for air and then fell back down. And he said, 'I went back to choking her again.'"

(R. 701.) Williams used his cell phone to take photographs and to record videos of his sexual abuse of K.H., which, Williams admitted, occurred

8

both before and after K.H.'s death. Investigators recovered the photographs and videos from Williams's cell phone.

## Standard of Review

Rule 45A, Ala. R. App. P., as amended effective January 12, 2023, provides:

> "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

This Court will continue to review the entire record for plain error in all cases in which the death penalty has been imposed.

> " 'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.' Hall v. State, 820 So. 2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So. 2d 152 (Ala. 2001). Plain error is 'error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So. 2d 819 (Ala. 1998). 'To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So. 2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So. 2d 237 (Ala. 2000). 'The plain error standard applies only where a particularly egregious error occurred at trial and that error has or

9

probably has substantially prejudiced the defendant.' <u>Ex parte Trawick</u>, 698 So. 2d at 167. '[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error.' <u>Ex parte Walker</u>, 972 So. 2d 737, 753 (Ala. 2007). Thus, '[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial.' <u>Wilson v. State</u>, 142 So. 3d 732, 751 (Ala. Crim. App. 2010). '[T]he plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' <u>United States v. Young</u>, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (quoting <u>United States v. Frady</u>, 456 U.S. 152, 163 n. 14, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982))."

<u>DeBlase v. State</u>, 294 So. 3d 154, 182-83 (Ala. Crim. App. 2018). That said,

"[b]ecause plain-error review is now discretionary, it is no longer necessary for this Court to address in its opinions every issue that is subject only to plain-error review and, even if we choose to address those issues, we are not required to engage in the type of in-depth analyses as we have in the past."

<u>Iervolino v. State</u>, 402 So. 3d 844, 862 (Ala. Crim. App. 2023). With these principles in mind, this Court will address Williams's appeal.

Discussion

In early 2025, Williams mailed the Office of the Attorney General a series of letters that stated his desire to drop his appeals and to have an execution date set. Although Williams could not drop his appeals because

10

his capital-murder convictions and sentence of death were subject to automatic review, see §§ 13A-5-53 and 13A-5-55, Ala. Code 1975, it appeared to the parties and to this Court that Williams sought to invoke his state-law right to represent himself on appeal. See Ex parte Scudder, 789 So. 2d 837, 841 (Ala. 2001) (holding that, "taken together, §§ 12-22-130 and 15-12-22(b)[, Ala. Code 1975,] confer upon a defendant in a criminal case the right to represent himself on appeal if he desires to do so"). To ensure that his decision was voluntarily and knowingly made, see Johnson v. State, 40 So. 3d 753, 757 (Ala. Crim. App. 2009), this Court on May 7, 2025, remanded the cause to the circuit court with instructions for it to conduct a hearing at which it should apprise Williams of the dangers and possible disadvantages of waiving his right to appellate counsel and invoking his right to represent himself.

On May 23, 2025, the circuit court conducted a hearing in accordance with this Court's instructions. During the hearing, the circuit court thoroughly informed Williams of the disadvantages and consequences of self-representation and a refusal to file an appellate brief. (Rem. R. 3-12.) The circuit court determined, based on his interactions with Williams during the hearing and before, during, and

11

after trial, that Williams's decisions were knowing and voluntary. (Rem. R. 13.)

Williams has indeed chosen not to file an appellate brief on his behalf, but his decision does not end this Court's review. Because Williams was convicted of capital murder and sentenced to death, his appeal is automatic, and this Court must review the propriety of the circuit court's finding that Williams's decision to represent himself on appeal and to forgo filing a brief on appeal was knowing and voluntary, the sufficiency of the evidence to sustain his convictions, and the propriety of his sentence of death. See §§ 12-22-150, 13A-5-53, and 13A-5-55, Ala. Code 1975; Rule 45A Ala. R. App. P. See also Sibley v. State, 775 So. 2d 235, 240 (Ala. Crim. App. 1996); Block v. State, 744 So. 2d 404, 406 (Ala. Crim. App. 1996).

I.

First, this Court must review the circuit court's finding that Williams's decision to represent himself on appeal and his waiver of appellate counsel was knowing and voluntary. Sibley, 775 So. 2d at 240; Block, 744 So. 2d at 406. This Court must also review whether Williams's decision to forgo filing a brief on appeal was knowing and voluntary. Id.

12

In <u>Faretta v. California</u>, 422 U.S. 806, 819-22 (1975), the United States Supreme Court explained that, although a defendant has a right to represent himself and waive the assistance of counsel, the intelligence of the waiver of counsel must be scrutinized. "When an [appellant] manages his own [appeal], he relinquishes ... many of the traditional benefits associated with the right to counsel." <u>Id.</u> at 835. Because an appellant who invokes his state-law right to represent himself and refuses to file a brief on his own behalf waives many traditional benefits, "'in order to represent himself the [appellant] must "knowingly and intelligently" forgo those relinquished benefits'" and "'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he's doing and his choice is made with eyes open."'" <u>Sibley</u>, 775 So. 2d at 242-43 (opinion on return to remand) (quoting <u>Faretta</u>, 422 U.S. at 835). "While it is desirable that the trial court engage, as it did in this case, in a colloquy in which it expressly advises the defendant of 'the dangers and disadvantages of self-representation,' such a colloquy is not mandated." <u>Moody v. State</u>, 888 So. 2d 532, 554 (Ala. Crim. App. 2003) (quoting <u>Tomlin v. State</u>, 601 So. 2d 124, 128 (Ala. 1991)). "The ultimate test is whether it 'appear[s] from

13

the record as a whole that a defendant's waiver of counsel and decision to represent himself were knowing and intelligent.'" Moody, 888 So. 2d at 554 (quoting Teske v. State, 507 So. 2d 569, 571 (Ala. Crim. App. 1987)). "Under this approach, the focus of the inquiry is on 'the particular facts and circumstances involved, "including the background, experience, and conduct of the accused."'" Moody, 888 So. 2d at 554 (quoting Tomlin, 601 So.2d at 128-29, quoting in turn Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).

A trial court may consider the following factors in determining whether a defendant's decision to represent himself was knowing and voluntary:

> "'(1) the background, experience and conduct of the defendant including his age, educational background, and his physical and mental health; (2) the extent to which the defendant had contact with lawyers prior to the trial; (3) the defendant's knowledge of the nature of the charges, the possible defenses, and the possible penalty; (4) the defendant's understanding of the rules of procedure, evidence and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which he aided the defendant; (7) whether the waiver of counsel was the result of mistreatment or coercion; or (8) whether the defendant was trying to manipulate the events of the trial.'"

Sibley, 775 So. 2d at 239 (opinion on original submission) (quoting Strozier v. Newsome, 871 F.2d 995, 998 (11th Cir. 1989)). See also United

14

States v. Cash, 47 F.3d 1083, 1088-89 (11th Cir. 1995) (listing the same factors). "'All factors need not point in the same direction.'" Sibley, 775 So. 2d at 243 (opinion on return to remand) (quoting Cash, 47 F.3d at 1089).

Williams was 40 years old at the time of the Faretta hearing; he was a high-school graduate and a veteran of the United States Air Force. There was no evidence indicating that Williams suffered from any physical or mental issues that would have affected his decision making or that he was under the influence of any drugs, legal or otherwise, or alcohol at the time of the hearing. Williams, having already been through a trial at which he was acquitted of child abuse, was quite familiar with the criminal judicial process.[5] It appears from the record that Williams had ample contact with his counsel both before and during trial. Before trial, counsel told the circuit court that he had been "over and over" "in detail" the implications of Williams's decision to waive the presentation of mitigation evidence (R. 64); the only expressed frustration, if it could be called that, was from Williams's counsel, who told the circuit court

---

[5] Williams admitted to Lt. Johnson that he had, in fact, committed the act of child abuse for which he had been acquitted. (R. 704-05.)

that Williams had been uncooperative in their attempts to gather mitigation evidence. (R. 75.) There was no question that Williams understood the significance of his convictions and his sentence -- in entering his guilty pleas, Williams explained to the circuit court that he wanted to "expedite the process" (R. 26), and Williams agreed with the circuit court at the Faretta hearing that his "execution was what we're discussing here today." (Rem. R. 5.) Williams testified that he had not been forced, coerced, or threatened in any way in making his decision to represent himself.

At the Faretta hearing, the circuit court informed Williams that he had the right to counsel and that, if he could not afford counsel, counsel would be appointed for him. (Rem. R. 6.) The circuit court thoroughly informed Williams of the dangers and difficulty of self-representation, particularly as an inmate without formal legal training. (Rem. R. 6-9.) The circuit court discussed with Williams this Court's automatic review of his convictions and sentence and the standard of review this Court would apply if he failed to file an appellate brief. (Rem. R. 10-11.) More to the point, the circuit court asked Williams if he understood that, "if

16

you don't make any additional appeals, you will face execution sooner." (Rem. R. 11.) Williams answered that he understood.

Given the record before this Court, we have no trouble concluding that Williams "not only knowingly, intelligently, and voluntarily, waived his right to counsel, but also his right to present issues to this court as it reviews his conviction and his sentence of death." Sibley, 775 So. 2d at 243 (opinion on return to remand). Additionally, we have no doubt "that when [Williams] 'decided to forgo presentation of any issues in the review of his conviction and death sentence he could appreciate his position and he knew that his life was at stake.'" Johnson v. State, 40 So. 3d 753, 758 (Ala. Crim. App. 2009) (quoting Sibley, 775 So. 2d at 244 (opinion on return to remand)). Therefore, the circuit court did not err in allowing Williams to exercise his right to self-representation on appeal.

## II.

This Court is obligated to review the sufficiency of the State's evidence to sustain Williams's guilty-plea convictions for capital murder. See § 13A-5-42, Ala. Code 1975. Williams pleaded guilty to four capital offenses -- murder made capital because he intentionally caused the death of K.H., who was less than 14 years of age, see § 13A-5-40(a)(15);

17

murder made capital because he intentionally caused the death of K.H. during the course of a first-degree kidnapping, see § 13A-5-40(a)(1); murder made capital because he intentionally caused the death of K.H. during a first-degree rape, see § 13A-5-40(a)(3); and murder made capital because he intentionally caused the death of K.H. during a first-degree sodomy, see § 13A-5-40(a)(3).

"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution." Powe v. State, 597 So. 2d 721, 724 (Ala. 1991) (citing Faircloth v. State, 471 So. 2d 485 (Ala. Crim. App. 1984)). "'The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So. 2d 497, 498 (Ala. Crim. App. 1997) (quoting O'Neal v. State, 602 So. 2d 462, 464 (Ala. Crim. App. 1992)). "'"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty the trial court should submit [the

case] to the jury, and, in such a case, this court will not disturb the trial court's decision."'" Sale v. State, 8 So. 3d 330, 338 (Ala. Crim. App. 2008) (citations omitted). "'"The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury."'" Ex parte Stewart, 900 So. 2d 475, 477 (Ala. 2004) (citations omitted). Further, in a capital case in which the defendant pleads guilty, "[t]he guilty plea may be considered in determining whether the state has met [its] burden of proof." § 13A-5-42, Ala. Code 1975.

The common element through all four of Williams's capital-murder convictions is that he intentionally caused the death of K.H. A person commits an intentional murder if, with "intent to cause the death of another person, he or she causes the death of that person." § 13A-6-2(a)(1), Ala. Code 1975. K.H.'s body was found underneath a tarp in the basement of Williams's duplex. Williams admitted to strangling K.H. to death, which aligned with the forensic pathologist's finding that K.H. died of asphyxia. (R. 788-90.) Williams explained to Lt. Johnson that he killed K.H. because, although Siple had agreed that he could engage in oral sex with K.H., "he got carried away and started raping her and

19

penetrating her vagina and anus, and he knew that he would get caught for that." (R. 702-03.) This was ample evidence that K.H. is dead and that Williams intentionally caused her death.

Williams pleaded guilty to murder made capital because he intentionally caused the death of K.H., who was less than 14 years of age, see § 13A-5-40(a)(15). The State presented evidence that K.H. was five years old at the time of her death. Thus, the State's evidence was sufficient to prove that Williams intentionally caused the death of a child less than 14 years of age.

Williams pleaded guilty to murder made capital because he intentionally caused the death of K.H. during the course of a first-degree kidnapping, see § 13A-5-40(a)(1). "A person commits the crime of kidnapping in the first degree if he abducts another person with intent to … [i]nflict physical injury upon him, or to violate or abuse him sexually." § 13A-6-43(a)(4), Ala. Code 1975. "Abduct" means to "restrain a person with intent to prevent his liberation by either … [s]ecreting or holding him in a place where he is not likely to be found, or … [u]sing or threatening to use deadly physical force." § 13A-6-40(2), Ala. Code 1975. "Restrain" means to:

"intentionally or knowingly restrict a person's movements unlawfully and without consent, so as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved.  Restraint is 'without consent' if it is accomplished by:

"a. Physical force, intimidation or deception, or

"b. Any means, including acquiescence of the victim, if he is a child less than 16 years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement."

§ 13A-6-40(1), Ala. Code 1975.

The State presented evidence indicating that Williams took K.H. from Siple's Columbus home with Siple's permission.  Yet, Williams did not have consent under § 13A-6-40(1)b. because Siple did not have legal custody of K.H.; sole custody had been vested with K.H.'s father. Williams first took K.H. to his property in Columbus, but, when Williams was seen by his wife with K.H., Williams took K.H. to his duplex in Phenix City.  Williams showed pornography to K.H. while they traveled to Phenix City and struck her when she refused to perform the acts in the pornography.   Williams took steps to hide his vehicle at the duplex, and he secreted K.H. in the basement of the duplex for the purpose of

21

sexually abusing her. In the basement, Williams bound and sexually abused K.H. and, ultimately, strangled her to death. Thus, the State's evidence was sufficient to prove that Williams intentionally caused the death of K.H. during a first-degree kidnapping.

Williams pleaded guilty to murder made capital because he intentionally caused the death of K.H. during a first-degree rape, see § 13A-5-40(a)(3). "A person commits the crime of rape in the first degree if he ... [b]eing 16 years old or older, engages in sexual intercourse with another person who is less than 12 years old." § 13A-6-61(a)(3), Ala. Code 1975. "Sexual intercourse" "has its ordinary meaning and occurs upon any penetration, however slight; emission is not required." § 13A-6-60(4), Ala. Code 1975.

In addition to Williams's admission that he, an adult male, had raped K.H., a five-year-old child, the officers who discovered K.H.'s body saw that K.H. had experienced vaginal bleeding. Further, the forensic pathologist noted tears and bruising to K.H.'s genitalia. Thus, the State's evidence was sufficient to prove that Williams intentionally caused the death of K.H. during a first-degree rape.

Finally, Williams pleaded guilty to murder made capital because he intentionally caused the death of K.H. during a first-degree sodomy, <u>see</u> § 13A-5-40(a)(3). "A person commits the crime of sodomy in the first degree if he … [b]eing 16 years old or older, engages in sodomy with a person who is less than 12 years old." § 13A-6-63(a)(3), Ala. Code 1975. "Sodomy" is defined as "[a]ny sexual act involving the genitals of one person and the mouth or anus of another person." § 13A-6-60(5), Ala. Code 1975.

In addition to Williams's admission that he, an adult male, had sodomized K.H., a five-year-old child, the officers who discovered K.H.'s body saw that K.H. had experienced anal bleeding. The forensic pathologist noted the same bloody discharge, and he testified that the damage to K.H.'s rectum was consistent with being anally penetrated. Thus, the State's evidence was sufficient to prove that Williams intentionally caused the death of K.H. during a first-degree sodomy.

The evidence of Williams's guilt on all four capital-murder charges, which included Williams's admission of guilt, was overwhelming. Consequently, this Court has no trouble concluding that the State met its burden of proof for each conviction.

III.

Although no longer required by Rule 45A, Ala. R. App. P., we have nonetheless reviewed the record in this case, and we find no plain error or defect in the guilt or penalty phase of the trial. See § 13A-5-53(a), Ala. Code 1975.

IV.

Pursuant to § 13A-5-53, Ala. Code 1975, this court is required to address the propriety of Williams's capital-murder convictions and his sentence of death. Williams was indicted for, and convicted of, murder made capital because he intentionally caused the death of K.H., who was less than 14 years of age, see § 13A-5-40(a)(15); murder made capital because he intentionally caused the death of K.H. during the course of a first-degree kidnapping, see § 13A-5-40(a)(1); murder made capital because he intentionally caused the death of K.H. during a first-degree rape, see § 13A-5-40(a)(3); and murder made capital because he intentionally caused the death of K.H. during a first-degree sodomy, see § 13A-5-40(a)(3). The circuit court found the following three statutory aggravating circumstances to exist based on the guilt-phase verdicts: 1) the capital offense was committed while the defendant was engaged in

24

the commission of a rape, see § 13A-5-49(4), Ala. Code 1975; 2) the capital

offense was committed while the defendant was engaged in a kidnapping,

see § 13A-5-49(4); and 3) the capital offense was committed when the

victim was less than 14 years of age, see § 13A-5-49(11), Ala. Code 1975.

In addition, the circuit court, as the sentencer, found that the State had

proven beyond a reasonable doubt that Williams's capital offenses were

especially heinous, atrocious, or cruel compared to other capital offenses,

see § 13A-5-49(8), Ala. Code 1975. The circuit court found only one

statutory mitigating circumstance to exist -- that Williams had no

significant history of prior criminal activity, see § 13A-5-51(1), Ala. Code

1975. Noting that Williams had waived the presentation of mitigating

evidence, the circuit court found the existence of only one nonstatutory

mitigating circumstance -- that Williams had accepted responsibility for

his conduct.

The circuit court found that the aggravating circumstances

outweighed the mitigating circumstances and sentenced Williams to

death. Our review of the sentencing order demonstrates that the circuit

court properly weighed the aggravating circumstances and the

25

mitigating circumstances and correctly sentenced Williams to death. The record supports the circuit court's decision.

The record does not reflect that Williams's sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1).

Section 13A-5-53(b)(2) requires this Court to reweigh the aggravating circumstances and the mitigating circumstances to determine whether Williams's sentence of death was proper. After independently weighing the aggravating and mitigating circumstances, this Court finds that Williams's death sentence is appropriate.

As required by § 13A-5-53(b)(3) this Court must determine whether Williams's sentence is excessive or disproportionate when compared to the penalties imposed in similar cases. Williams was convicted of four counts of capital murder during his kidnapping, rape, and sodomy of five-year-old K.H. A sentence of death has been imposed for similar crimes throughout this State. See Lewis v. State, 889 So. 2d 623 (Ala. Crim. App. 2003); Scott v. State, 937 So. 2d 1065 (Ala. Crim. App. 2005); Jones v. State, 43 So. 3d 1258 (Ala. Crim. App. 2007). Therefore, this Court finds that the sentence was neither excessive nor disproportionate.

Accordingly, Williams's capital-murder convictions and his sentence of death are affirmed. For the reasons stated in note 1, the portion of Williams's appeal that relates to his noncapital convictions is dismissed.

AFFIRMED IN PART; APPEAL DISMISSED IN PART.

Kellum, Cole, Minor, and Anderson, JJ., concur.